**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|  |  |
|---|---|
| THE ROMAN CATHOLIC ARCHDIOCESE OF ATLANTA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KATHLEEN SEBELIUS, in her official capacity as Secretary, United States Department of Health and Human Services, *et al.*, <br><br> Defendants. | Case No. 1:12-cv-03489-WSD |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................... 1

BACKGROUND ...................................................................................... 7

I.   STATUTORY BACKGROUND .................................................... 7

II.  CURRENT PROCEEDINGS ..................................................... 15

STANDARD OF REVIEW ..................................................................... 16

ARGUMENT ......................................................................................... 16

    I.   THE COURT SHOULD DISMISS THIS CASE FOR LACK OF
        JURISDICTION BECAUSE PLAINTIFFS LACK STANDING ........... 16

    II.  THE COURT SHOULD DISMISS THIS CASE FOR LACK OF
        JURISDICTION BECAUSE IT IS NOT RIPE ...................................... 25

CONCLUSION ...................................................................................... 35

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967)................................................................ *passim*

*Alabama-Tombigbee Rivers Coal. v. Norton*,
    338 F.3d 1244 (11th Cir. 2003) ....................................................21

*Am. Civil Liberties Union of Fla., Inc. v. Dixie Cnty., Fla.*,
    690 F.3d 1244 (11th Cir. 2012) ....................................................19

*Am. Petroleum Inst. v. EPA*,
    683 F.3d 382 (D.C. Cir. 2012)......................................................29

*Apex Digital, Inc. v. Sears, Roebuck & Co.*,
    572 F.3d 440 (7th Cir. 2009) .......................................................24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................24

*Belmont Abbey Coll. v. Sebelius*,
    2012 WL 2914417 (D.D.C. July 18, 2012) ......................... *passim*

*Bethlehem Steel Corp. v. EPA*,
    536 F.2d 156 (7th Cir. 1976) ...........................................30, 31, 33

*Catholic Diocese of Nashville v. Sebelius*,
    2012 WL 5879796 (M.D. Tenn. Nov. 21, 2012)……………………..*passim*

*Cephalon, Inc. v. Sebelius*,
    796 F. Supp. 2d 212 (D.D.C. 2011)..............................................33

*Cont'l Airlines, Inc. v. Civil Aeronautics Bd.*,
    522 F.2d 107 (D.C. Cir. 1975)........................................................27

*Corey H. v. Bd. of Educ. of Chi.*,
    534 F.3d 683 (7th Cir. 2008) ........................................................32

*Lake Pilots Ass'n v. U.S. Coast Guard*,
    257 F. Supp. 2d 148 (D.D.C. 2003)..........................................30, 32

*Legatus v. Sebelius*,
    2012 WL 5359630 (E.D. Mich. Oct. 31, 2012)....................................5, 7, 19

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................................... *passim*

*McConnell v. FEC*,
    540 U.S. 93 (2003)...................................................................21, 24

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
    538 U.S. 803 (2003)...................................................................25

*Nebraska v. U.S. Dep't of Health & Human Servs.*,
    2012 WL 2913402 (D. Neb. July 17, 2012)...............................6, 18, 19, 34

*Nw. Airlines, Inc. v. FAA*,
    795 F.2d 195 (D.C. Cir. 1986).......................................................23

*Occidental Chem. Corp. v. FERC*,
    869 F.2d 127 (2d Cir. 1989) .....................................................28, 29

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998)...................................................................29

*Ouachita Watch League v. Jacobs*,
    463 F.3d 1163 (11th Cir. 2006) .................................................25, 26

iii

*Pittman v. Cole*,
 267 F.3d 1269 (11th Cir. 2001) ..............................................................30, 31

*Pub. Serv. Comm'n v. Wycoff Co.*,
 344 U.S. 237 (1952)............................................................................25, 30

*Rock Energy Coop. v. Vill. of Rockton*,
 614 F.3d 745 (7th Cir. 2010) ........................................................................33

*Roman Catholic Archdiocese of New York v. Sebelius*,
 2012 WL 6042864 (E.D.N.Y. Dec. 4, 2012).................................6, 18, 22, 30

*Steel Co. v. Citizens for a Better Env't*,
 523 U.S. 83 (1998).......................................................................................16

*Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*,
 411 F.3d 1242 (11th Cir. 2005) ...................................................................16

*Tenn. Gas Pipeline Co. v. F.E.R.C.*,
 736 F.2d 747 (D.C. Cir. 1984)...............................................................33, 35

*Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*,
 413 F.3d 479 (5th Cir. 2005) .................................................................29, 31

*Texas v. United States*,
 523 U.S. 296 (1998)....................................................................................28

*Toca Producers v. FERC*,
 411 F.3d 262 (D.C. Cir. 2005)....................................................................31

*ViroPharma, Inc. v. Hamburg*,
 777 F. Supp. 2d 140 (D.D.C. 2011)............................................................23

*Warner Cable Commc'ns, Inc. v. City of Niceville*,
 911 F.2d 634 (11th Cir. 1990) ...............................................................26, 29

iv

*Wheaton Coll. v. Sebelius*,
　　2012 WL 3637162 (D.D.C. Aug. 24, 2012) ......................................... *passim*

*Whitmore  v. Arkansas*,
　　495 U.S. 149 (1990) ......................................................................17, 21, 24

*Wilderness Soc'y v. Alcock*,
　　83 F.3d 386 (11th Cir. 1996) ........................................................................29

*Wilmac Corp. v. Bowen*,
　　811 F.2d 809 (3d Cir. 1987) ........................................................................33

*Wolff v. Cash 4 Titles*,
　　351 F.3d 1348 (11th Cir. 2003) ...................................................................17

*Zubik v.  Sebelius*,
　　2012 WL 5932977 (W.D. Pa. Nov. 27, 2012) ...................................... *passim*

## STATUTES

26 U.S.C. §501(a) ...............................................................................................11

26 U.S.C. § 4980H ..............................................................................................8

26 U.S.C. § 6033(a)(1), (a)(3)(A)(i),(A) ...........................................................11

42 U.S.C. § 300gg-13 .........................................................................................8

42 U.S.C. § 300gg-91(a)(1) ................................................................................8

42 U.S.C. § 18011(a)(2) ....................................................................................18

Pub. L. No. 111-148, 124 Stat. 119 (2010) .....................................................1, 8

## FEDERAL REGULATIONS

26 C.F.R. § 54.9815-1251T ....................................................................1

26 C.F.R. § 54.9815-1251T(a), (g)(1) ...................................................18

26 C.F.R. § 54.9815-2713T(b)(1) ............................................................9

29 C.F.R. § 2590.715-2713(b)(1) .............................................................9

29 C.F.R. § 2590.715-1251 .......................................................................1

29 C.F.R. § 2590.715-1251(a), (g)(1) .....................................................18

45 C.F.R. § 147.130(b)(1) .........................................................................9

45 C.F.R. § 147.140(a)(1)(iv)(A) ............................................................11

45 C.F.R. § 147.140(a)(1)(iv)(B) ............................................................11

75 Fed. Reg. 41,726 (July 19, 2010) ........................................................9

76 Fed. Reg. 46,621 (Aug. 3, 2011) ..................................................10, 12

77 Fed. Reg. 16,501 (Mar. 21, 2012) ..........................................14, 21, 31

77 Fed. Reg. 8725 (Feb. 15, 2012) ............................................... *passim*

## MISCELLANEOUS

FDA, Birth Control Guide ........................................................................10

HHS, Guidance on the Temporary Enforcement Safe Harbor (Aug. 15, 2012) ...............................................................................13, 20, 23, 34

HRSA, Women's Preventive Services: Required Health
    Plan Coverage Guidelines.................................................................................10

INST. OF MED., CLINICAL PREVENTIVE SERVICES FOR WOMEN:
    CLOSING THE GAPS 19-20, 109 (2011).......................................................8, 9

**INTRODUCTION**

The Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010),[1] and implementing regulations, require all group health plans and health insurance issuers that offer non-grandfathered group or individual health coverage to provide coverage for certain recommended preventive services without cost-sharing (such as a copayment, coinsurance, or a deductible).[2]   As relevant here, except as to group health plans of certain religious employers (and group health insurance coverage sold in connection with those plans), the preventive services that must be covered include all Food and Drug Administration ("FDA")-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity, as prescribed by a health care provider.   Plaintiffs, the Roman Catholic Archdiocese of Atlanta and Archbishop Gregory, Christ the King Catholic School, Catholic Charities of the Archdiocese of Atlanta, and the Roman Catholic Diocese of Savannah and Bishop Hartmayer, filed suit on October 5, 2012, seeking to have the Court invalidate and

---

[1] Amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010).

[2] A grandfathered plan is one that was in existence on March 23, 2010 and that has not undergone any of a defined set of changes since that date.   26 C.F.R. § 54.9815-1251T; 29 C.F.R. § 2590.715-1251; 45 C.F.R. § 147.140.

enjoin the preventive services coverage regulations.  Plaintiffs allege that their sincerely held religious beliefs prohibit them from providing the required coverage for certain services.

Recently, defendants finalized an amendment to the preventive services coverage regulations, issued guidance on a temporary enforcement safe harbor, and initiated a rulemaking to further amend the regulations, all designed to address religious concerns such as those raised by plaintiffs.  The finalized amendment confirms that group health plans sponsored by certain religious employers (and any associated group health insurance coverage) are exempt from the requirement to cover contraceptive services.  The enforcement safe harbor encompasses a group of non-profit organizations with religious objections to providing contraceptive coverage; it provides that defendants will not bring any enforcement action against such organizations that meet certain criteria (and associated health plans and issuers) during the safe harbor period, which is in effect until the first plan year that begins on or after August 1, 2013.  Finally, defendants published an advance notice of proposed rulemaking ("ANPRM") in the Federal Register that confirms defendants' intent, before the expiration of the safe harbor period, to propose and finalize additional amendments to the preventive services coverage regulations to

2

further accommodate non-exempt, non-grandfathered religious organizations' religious objections to covering contraceptive services. The ANPRM suggests ideas and solicits public comment on potential accommodations, including, but not limited to, requiring health insurance issuers to offer health coverage without contraceptive coverage to religious organizations that object to such coverage and simultaneously to offer contraceptive coverage directly to such organizations' plan participants, at no charge to the organization or participant.

In light of these actions, this Court lacks authority to adjudicate plaintiffs' claims. At the outset, plaintiffs' suit must be dismissed for lack of jurisdiction because plaintiffs have not alleged any imminent injury from the operation of the challenged regulations. Plaintiffs offer health insurance plans for their employees, but they concede that those plans – which according to the complaint do not cover contraceptive services – are eligible for grandfather status. Thus, plaintiffs have not shown that they are under any current obligation to offer coverage for contraceptive services.

Moreover, even if plaintiffs' group health plans were not grandfathered, plaintiffs appear to qualify for the temporary enforcement safe harbor – and, indeed, they do not allege otherwise. Pursuant to the safe harbor, defendants will

not take any enforcement action against plaintiffs until at least January 1, 2014 in the case of the Atlanta plaintiffs, and July 1, 2014 in the case of the Savannah plaintiffs.  And defendants' initiation of a rulemaking that commits to amending the preventive services coverage regulations well before those dates in order to accommodate the religious objections of organizations like plaintiffs further demonstrates the absence of any imminent harm.  Because the regulations will therefore have changed by the earliest time defendants could enforce them against plaintiffs, any injury is wholly speculative at this time.  The amended regulations likely will address plaintiffs' concerns (after all, that is the intent of the ongoing rulemaking), and at the very least, the amendments will change what the Court is to review.  Nor can plaintiffs transform their allegations of speculative future harm into a current concrete injury by claiming a need to prepare for that speculative future harm.

For similar reasons, the Court lacks jurisdiction because this case is not ripe. Plaintiffs' challenge to the preventive services coverage regulations is not fit for judicial review because defendants have initiated a rulemaking to amend the challenged regulations to accommodate the religious objections of religious organizations like plaintiffs to providing contraceptive coverage.  Review now

4

would impermissibly interfere with defendants' ongoing rulemaking and expend the parties' and the Court's resources unnecessarily – requiring the parties to brief the propriety of, and the Court to issue rulings on, two sets of regulations.  In fact, it would result in an advisory decision on the regulations in their current form even though they do not and will not harm plaintiffs in such form (if ever).  In the meantime, the enforcement safe harbor will be in effect such that plaintiffs will not suffer hardship as a result of their failure to cover contraceptive services.

Indeed, nearly every court to have considered defendants' jurisdictional arguments to date has ruled in defendants' favor and rejected or dismissed nearly identical challenges to the preventive services coverage regulations.  *See Zubik v. Sebelius*, No. 2:12-cv-00676, 2012 WL 5932977 (W.D. Pa. Nov. 27, 2012); *Catholic Diocese of Nashville v. Sebelius*, No. 3-12-0934, 2012 WL 5879796 (M.D. Tenn. Nov. 21, 2012); *Legatus v. Sebelius*, No. 12-12061, 2012 WL 5359630 (E.D. Mich. Oct. 31, 2012)[3]; *Wheaton Coll. v. Sebelius*, Civil Action No.

---

[3] The court in *Legatus* denied a non-profit plaintiff's motion for preliminary injunction, finding that it lacked standing to assert its claims because it qualified for the temporary enforcement safe harbor.  The court did, however, enjoin the application of the preventive services coverage regulations with respect to the *for-*profit plaintiff in that case, since that plaintiff, by contrast, did not qualify for the

12-1169(ESH), 2012 WL 3637162 (D.D.C. Aug. 24, 2012), *appeal docketed*, No. 12-5273 (D.C. Cir. Sept. 12, 2012); *Belmont Abbey Coll. v. Sebelius*, Civil Action No. 11-1989(JEB), 2012 WL 2914417 (D.D.C. July 18, 2012), *appeal docketed*, No. 12-5291 (D.C. Cir. Sept. 14, 2012); *Nebraska v. U.S. Dep't of Health & Human Servs.*, No. 4:12CV3035, 2012 WL 2913402 (D. Neb. July 17, 2012), *appeal docketed*, No. 12-3238 (8th Cir. Sept. 25, 2012).[4]   The court in *Nebraska* held that the religious organization plaintiffs had not shown any injury and so lacked standing because they, like plaintiffs here, either did not allege with sufficient specificity that their health plans were not grandfathered or admitted that they were grandfathered.   *See* 2012 WL 2913402, at *12-13.   The court also

---

safe harbor.  Defendants believe the court's entry of the preliminary injunction was in error, on other grounds.

[4] Only one court has partially denied defendants' motion to dismiss.  *Roman Catholic Archdiocese of New York v. Sebelius*, No. 12 Civ. 2542, 2012 WL 6042864 (E.D.N.Y. Dec. 5, 2012).  Defendants believe that case was wrongly decided to the extent the court denied the motion to dismiss because, while professing to assume defendants' good faith, the court nonetheless failed to credit defendants' clear and repeated assurances that they will never enforce the challenged regulations against plaintiffs in their current form.  Instead, the court based its ruling on the mistaken assumption that a "substantial possibility of enforcement" remains.  2012 WL 6042864, at *15.  No other court has seen any basis on which to so conclude, and respectfully, none exists.  But even in *Archdiocese of New York*, the court granted defendants' motion to dismiss as to plaintiffs that, like all plaintiffs here, did not sufficiently allege their plans were not grandfathered.  *Id.* at *12.

concluded, although it did not need to reach the issue, that the plaintiffs' claims were not ripe because the preventive services coverage regulations are not being enforced against the plaintiffs and are currently undergoing a process of amendment to accommodate the plaintiffs' religious concerns. *See id.* at *20-24. The courts in *Zubik*, *Catholic Diocese of Nashville*, *Wheaton*, and *Belmont Abbey* reached the same conclusion regarding ripeness, and also held, along with the court in *Legatus*, that the non-grandfathered plaintiffs had not shown any imminent injury necessary to establish standing given the enforcement safe harbor and the forthcoming amendments to the regulations. *See Zubik*, 2012 WL 5932977, at *7-12; *Catholic Diocese of Nashville*, 2012 WL 5879796, at *3-5; *Legatus*, 2012 WL 5359630, at *5-6; *Wheaton*, 2012 WL 3637162, at *4-8; *Belmont Abbey*, 2012 WL 2914417, at *9-14.  In short, six courts have now rejected or dismissed the claims of religious organizations on the same grounds urged in this motion.  Defendants respectfully ask this Court to do the same.

## **BACKGROUND**

## I.    STATUTORY BACKGROUND

Prior to the enactment of the ACA, many Americans did not receive the preventive health care they needed to stay healthy, avoid or delay the onset of

disease, lead productive lives, and reduce health care costs.  Due in large part to cost, Americans used preventive services at about half the recommended rate.  *See* INST. OF MED., CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS 19-20, 109 (2011), *available at* http://www.nap.edu/catalog.php?record_id=13181 (last visited Dec. 10, 2012) ("IOM REP.").  Section 1001 of the ACA – which includes the preventive services coverage provision relevant here – seeks to cure this problem by making recommended preventive care affordable and accessible for many more Americans.  Specifically, the preventive services coverage provision requires all group health plans and health insurance issuers that offer non-grandfathered group or individual health coverage to provide coverage for certain preventive services without cost-sharing.[5]  42 U.S.C. § 300gg-13.  Those preventive services that must be covered include, as relevant here, preventive care and screenings for women as provided for in comprehensive guidelines supported

---

[5] A group health plan includes a plan established or maintained by an employer that provides health coverage to employees.  42 U.S.C. § 300gg-91(a)(1).  Group health plans may be insured (i.e., medical care underwritten through an insurance contract) or self-insured (i.e., medical care funded directly by the employer).  The ACA does not require employers to provide health coverage for their employees, but, beginning in 2014, certain large employers may face assessable payments if they fail to do so under certain circumstances.  26 U.S.C. § 4980H.

by the Health Resources and Services Administration ("HRSA").[6]  *Id.* at § 300gg-13(a)(4).

Defendants issued interim final regulations implementing the preventive services coverage provision on July 19, 2010.  75 Fed. Reg. 41,726.  Those regulations, among other things, impose the requirements of that provision for plan years (or, in the individual market, policy years) that begin on or after the date that is one year after the date on which a new guideline is issued.  26 C.F.R. § 54.9815-2713T(b)(1); 29 C.F.R. § 2590.715-2713(b)(1); 45 C.F.R. § 147.130(b)(1).  Because there were no existing HRSA guidelines relating to preventive care and screening for women, the Department of Health and Human Services ("HHS") tasked the Institute of Medicine ("IOM")[7] with "review[ing] what preventive services are necessary for women's health and well-being" and developing recommendations for comprehensive guidelines.  IOM REP. at 2.  IOM conducted an extensive science-based review and, on July 19, 2011, published a report of its analysis and recommendations.  *Id.* at 20-26.  The report recommended that HRSA

_____

[6] HRSA is an agency within the Department of Health and Human Services.

[7] IOM was established in 1970 by the National Academy of Sciences and is funded by Congress.  IOM REP. at iv.  It secures the services of eminent members of appropriate professions to examine policy matters pertaining to the health of the public and provides expert advice to the federal government.  *Id.*

guidelines include, among other things, well-woman visits, breastfeeding support, domestic violence screening, and, as relevant here, "the full range of [FDA]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." *Id.* at 10-12.  FDA-approved contraceptive methods include diaphragms, oral contraceptive pills, emergency contraceptives (such as Plan B and Ella), and intrauterine devices. FDA, Birth Control Guide, *available at* http://www.fda.gov/downloads/ForConsumers/ByAudience/ForWomen/FreePublications/UCM282014.pdf (last visited Dec. 10, 2012).

On August 1, 2011, HRSA adopted IOM's recommendations, subject to an exemption relating to certain religious employers authorized by an amendment to the interim final regulations.  *See* HRSA Guidelines, *available at* http://www.hrsa.gov/womensguidelines/ (last visited Dec. 10, 2012).  The amendment to the interim final regulations, issued on the same day, authorized HRSA to exempt group health plans sponsored by certain religious employers (and any associated group health insurance coverage) from any requirement to cover contraceptive services under HRSA's guidelines.  76 Fed. Reg. 46,621 (Aug. 3,

2011); 45 C.F.R. § 147.130(a)(1)(iv)(A). To qualify for the exemption, an employer must meet the following criteria:

(1) The inculcation of religious values is the purpose of the organization.

(2) The organization primarily employs persons who share the religious tenets of the organization.

(3) The organization serves primarily persons who share the religious tenets of the organization.

(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

45 C.F.R. § 147.130(a)(1)(iv)(B). The sections of the Internal Revenue Code referenced in the fourth criterion refer to "churches, their integrated auxiliaries, and conventions or associations of churches," as well as "the exclusively religious activities of any religious order," that are exempt from taxation under 26 U.S.C. § 501(a). 26 U.S.C. § 6033(a)(1), (a)(3)(A)(i), (a)(3)(A)(iii). Thus, as relevant here, the amended interim final regulations require non-grandfathered plans that do not qualify for the religious employer exemption to provide coverage for recommended contraceptive services, without cost-sharing, for plan years beginning on or after August 1, 2012.

Defendants requested comments on the amended interim final regulations and specifically on the definition of religious employer contained in those regulations.  76 Fed. Reg. at 46,623.  After carefully considering the thousands of comments they received, defendants decided to adopt in final regulations the definition of religious employer contained in the amended interim final regulations, while also creating a temporary enforcement safe harbor for non-grandfathered plans sponsored by certain non-profit organizations with religious objections to contraceptive coverage (and any associated group health insurance coverage).  77 Fed. Reg. 8725, 8727 (Feb. 15, 2012).

Pursuant to the temporary enforcement safe harbor as clarified on August 15, 2012, defendants will not take any enforcement action against an employer, group health plan, or group health insurance issuer with respect to a non-grandfathered group health plan that fails to cover some or all recommended contraceptive services and that is sponsored by an organization that meets the following criteria:

(1) The organization is organized and operates as a non-profit entity.

(2) From February 10, 2012 onward, the group health plan established or maintained by the organization has consistently not provided all or the same subset of the contraceptive coverage otherwise required at any

point, consistent with any applicable State law, because of the religious beliefs of the organization.

(3) The group health plan sponsored by the organization (or another entity on behalf of the plan, such as a health insurance issuer or third-party administrator) provides to plan participants a prescribed notice indicating that the plan will not provide some or all contraceptive coverage for the first plan year beginning on or after August 1, 2012.

(4) The organization self-certifies that it satisfies the three criteria above, and documents its self-certification in accordance with prescribed procedures.[8]

The enforcement safe harbor will be in effect until the first plan year that begins on or after August 1, 2013.  Guidance at 3.  By that time, defendants expect that significant changes to the preventive services coverage regulations will have altered the landscape with respect to certain religious organizations by providing them with further accommodations.

Those intended changes, which were first announced when defendants finalized the religious employer exemption, would establish alternative means of providing contraceptive coverage without cost-sharing while also accommodating non-exempt, non-grandfathered religious organizations' religious objections to

---

[8] HHS, Guidance on the Temporary Enforcement Safe Harbor ("Guidance") (Aug. 15, 2012), *available at* http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf (last visited Dec. 10, 2012).

covering contraceptive services. 77 Fed. Reg. at 8728. Defendants began the process of further amending the regulations on March 21, 2012, when they published an ANPRM in the Federal Register. 77 Fed. Reg. 16,501 (Mar. 21, 2012). The ANPRM "presents questions and ideas" on potential means of achieving the goals of providing women access to contraceptive services without cost-sharing while accommodating religious organizations' religious liberty interests. *Id*. at 16,503. The purpose of the ANPRM is to provide "an early opportunity for any interested stakeholder to provide advice and input into the policy development relating to the accommodation to be made" in the forthcoming amendments to the regulations. *Id*.

Having received comments on the ANPRM, defendants will publish a notice of proposed rulemaking, which will be subject to further public comment, before defendants issue further amendments to the preventive services coverage regulations. *Id*. at 16,501. Defendants intend to finalize the amendments to the regulations such that they are effective before the end of the temporary enforcement safe harbor. *Id*. at 16,503.

## II.    CURRENT PROCEEDINGS

Plaintiffs brought this action on October 5, 2012 to challenge the lawfulness of the preventive services coverage regulations to the extent that the regulations require that the health coverage they make available to their employees cover contraceptive services.   Plaintiffs describe themselves as "Catholic religious entities that provide a wide range of spiritual, educational, social, and medical services" to Catholics and non-Catholics throughout Georgia.  Compl. ¶ 2, Oct. 5, 2012, ECF No. 1.  The Atlanta Archdiocese provides a self-insured group health insurance plan for its employees (the "Atlanta Plan").  Christ the King School and Catholic Charities offer coverage for their employees through the Atlanta Plan as well.  *Id.* ¶ 39.  The Diocese of Savannah provides three self-insured group health insurance plans for employees of the Diocese, the parishes, and schools within the Diocese (the "Savannah Plan").  *Id.* ¶ 41.  Plaintiffs allege they cannot provide health insurance covering "abortion-inducing drugs, sterilization, and contraception" without violating their "sincerely held religious beliefs."  *See, e.g.*, *id.* ¶ 1.  Plaintiffs claim the preventive services coverage regulations violate the Religious Freedom Restoration Act, the First Amendment to the United States Constitution, the nondelegation doctrine, and the Administrative Procedure Act.

## STANDARD OF REVIEW

Defendants move to dismiss the Complaint for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. "The burden for establishing federal subject matter jurisdiction rests with the party bringing the claim." *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247 (11th Cir. 2005). Where, as here, defendants challenge jurisdiction on the face of the Complaint, the Complaint must plead sufficient facts to establish that jurisdiction exists. This Court must determine whether it has subject matter jurisdiction before addressing the merits of the Complaint. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).

## ARGUMENT

## I.   THE COURT SHOULD DISMISS THIS CASE FOR LACK OF JURISDICTION BECAUSE PLAINTIFFS LACK STANDING

Plaintiffs lack standing because they have not alleged a concrete and imminent injury resulting from the operation of the preventive services coverage regulations. To meet their burden to establish standing, plaintiffs must demonstrate they have "suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or

16

imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotations omitted).   The harm must be "distinct and palpable" and "actual or imminent." *Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1353, 1358 (11th Cir. 2003) (internal quotations and citations omitted).   Allegations of possible future injury do not suffice; rather, "[a] threatened injury must be certainly impending to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (quotation omitted).   A plaintiff that "alleges only an injury at some indefinite future time" has not shown an injury in fact, particularly where "the acts necessary to make the injury happen are at least partly within the plaintiff's own control." *Lujan*, 504 U.S. at 564 n.2.   In these situations, "the injury [must] proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all." *Id.*

Here, plaintiffs have not alleged any imminent injury in fact because they concede they "believe that the Atlanta Plan and Savannah Plan currently meet the Affordable Care Act's definition of a 'grandfathered plan.'"   Compl. ¶ 44.   A grandfathered plan is a health plan in which at least one individual was enrolled on March 23, 2010 and that has continuously covered at least one individual since that date, and the preventive services coverage regulations do not apply to such plans.

42 U.S.C. § 18011(a)(2); 26 C.F.R. § 54.9815-1251T(a), (g)(1); 29 C.F.R. § 2590.715-1251(a), (g)(1); 45 C.F.R. § 147.140(a), (g)(1).  Because their plans are not subject to the regulations, plaintiffs have no standing to challenge them.  *See Archdiocese of New York*, 2012 WL 6042864, at *12; *Zubik*, 2012 WL 5932977, at *11; *Nebraska*, 2012 WL 2913402, at *12-13.

A grandfathered plan may lose its grandfathered status if, compared to its existence on March 23, 2010, it eliminates all or substantially all benefits to diagnose or treat a particular condition, increases a percentage cost-sharing requirement, significantly increases a fixed-amount cost-sharing requirement, significantly reduces the employer's contribution, or imposes or tightens an annual limit on the dollar value of any benefits.  26 C.F.R. § 54.9815-1251T(a), (g)(1); 29 C.F.R. § 2590.715-1251(a), (g)(1); 45 C.F.R. § 147.140(a), (g)(1).  Plaintiffs contend that they will lose grandfather status "in the near future for reasons that cannot be avoided," and point to their "anticipate[d]" response to the "long term trajectory of health care costs" nationwide.  Compl. ¶ 46.  But asserted future intent or "anticipat[ion]," *id.*, and "'some day' intentions – without any description of concrete plans," *Lujan*, 504 U.S. at 564, do not establish an injury in fact.  *See also id*. at 564 n.2 (allegations of injury "at some indefinite future time" do not establish

an injury in fact, particularly where "the acts necessary to make the injury happen are at least partly within the plaintiff's own control"); *Am. Civil Liberties Union of Florida, Inc. v. Dixie Cnty., Fla.*, 690 F.3d 1244, 1256 (11th Cir. 2012).  Because none of the plaintiffs "allege[s] that [it] intends to make – or is even contemplating –specific changes to its plan that would end its grandfathered status," the mere assertion that grandfather status will be lost "is insufficient" to establish standing. *Nebraska*, 2012 WL 2913402, at *12; *see Zubik*, 2012 WL 5932977, at *8 n.14, *11.  Similarly, plaintiffs' reliance on broad projections does not carry their burden to show "that *they* lack (or will soon lose) grandfather status" and therefore have standing.  *Nebraska*, 2012 WL 2913402, at *13.[9]

---

[9] Plaintiffs' allegation that they are forced to maintain grandfathered status "in perpetuity," Compl. ¶ 45, is similarly insufficient to establish injury because it is predicated on speculative (and highly unlikely) future harm.  Moreover, because of the safe harbor and forthcoming regulatory amendments, any decision to retain that status cannot reasonably be based on plaintiffs' concerns that they would otherwise become subject to the regulations they seek to challenge.  As the court in *Zubik* explained in dismissing a similar claim, even if plaintiffs' plans ceased to be grandfathered tomorrow, the safe harbor makes the threatened harm "too remote to constitute 'imminent' injury."  *Zubik*, 2012 WL 5932977, at *11.  The court in *Catholic Diocese of Nashville* also dismissed the claims of the plaintiffs who argued they were injured by being forced to maintain grandfather status.  2012 WL 5879796, at *3-4; *see* Compl., *Catholic Diocese of Nashville v. Sebelius*, No. 3-12-0934 (M.D. Tenn. Sept. 12, 2012), ECF No. 1.  After all, if plaintiffs lost grandfathered status, they would be in precisely the same, uninjured position as the

Even if plaintiffs' group health plans were not grandfathered, plaintiffs still would not have alleged an injury in fact.  Under the enforcement safe harbor, defendants will not take any enforcement action against a qualifying organization until the first plan year that begins on or after August 1, 2013.  Guidance at 3. Plaintiffs do not offer any suggestion that they will be unable to satisfy the criteria for the safe harbor, and there is nothing in the Complaint to suggest plaintiffs will be unable to meet those criteria.  Because the Complaint indicates that the plan year begins on January 1 for the Atlanta Plan, *see* Compl. ¶ 40, and on July 1 for the Savannah Plan, *see id.* ¶ 42, the earliest any plaintiff could be subject to any enforcement action by defendants for failing to provide contraceptive coverage is January 1, 2014.  With such a long time before the inception of any possible injury and with the challenged regulations undergoing further amendment before then, plaintiffs' asserted injury is simply "too remote temporally" to satisfy the imminence requirement for standing.  *See McConnell v. FEC*, 540 U.S. 93, 226 (2003) (concluding Senator lacked standing based on claimed desire to air

---

plaintiffs in *Belmont Abbey* and *Wheaton*, and as the non-profit plaintiff in *Legatus*. The combination of grandfathering and the safe harbor means that the standing allegations of plaintiffs here are weaker than those of the plaintiffs in those other cases – none of which were sufficient.

20

advertisements five years in the future), *overruled in part on other grounds*, *Citizens United v. FEC*, 130 S. Ct. 876 (2010); *Whitmore*, 495 U.S. at 159-60.

This defect in plaintiffs' suit does not merely implicate a technical issue of counting intermediate days, but instead goes to the fundamental limitations on the role of federal courts.  The purpose of the imminence requirement is "to reduce the possibility of deciding 'a case in which no injury would have occurred at all.'" *Alabama-Tombigbee Rivers Coalition v. Norton*, 338 F.3d 1244, 1253 (11th Cir. 2003) (quoting *Lujan*, 504 U.S. at 564 n.2).  The ANPRM published in the Federal Register confirms, and seeks comment on, defendants' intention to propose and finalize further amendments to the preventive services coverage regulations that would further accommodate the concerns of religious organizations like plaintiffs that object to providing contraceptive coverage for religious reasons.  77 Fed. Reg. at 16,501.  In light of these forthcoming amendments, the opportunity the rulemaking process provides for plaintiffs to help shape them and offer new ideas, *id.* at 16,503, 16,507, and defendants' intention to finalize the amendments to the regulations before the enforcement safe harbor expires, *id.* at 16,503; *see also* 77 Fed. Reg. at 8278, there is no reason to suspect that plaintiffs will be required to

sponsor a health plan that covers contraception in contravention of their religious beliefs once the safe harbor expires.[10]

Any suggestion to the contrary is entirely speculative at this point.[11]  At the very least, given the anticipated changes to the preventive services coverage regulations, plaintiffs' claims of injury, if any, after the temporary enforcement safe harbor expires would differ substantially from plaintiffs' current claims of injury.  And, given the existing enforcement safe harbor, there is no basis for this Court to consider the merits of plaintiffs' Complaint at this juncture.[12]  *See*

---

[10] As noted above, *supra* note 4, the court in *Archdiocese of New York* found standing based on the erroneous assumption that, despite such clear and repeated assurances, a "substantial possibility of enforcement" remains.  2012 WL 6042864, at *15.

[11] Plaintiffs insist that the proposals contained in the ANPRM are insufficient to protect their rights, Compl. ¶¶ 87-88, 95-97, but plaintiffs cannot now know what form the final accommodations will take once the rulemaking process reaches its conclusion.  To suggest otherwise prejudges the process and ignores the opportunity for comments by plaintiffs and others to inform the rulemaking.  And even assuming that plaintiffs would continue to object to any future form the accommodations may take, it would be premature for this Court to evaluate plaintiffs' challenges in the absence of the finalized amendments.

[12] Plaintiffs allege it is unclear whether any of them qualify for the existing regulations' exemption for certain religious employers.  *See* Compl. ¶¶ 11-13, 75-77.  Their concern is irrelevant at this stage.  Even assuming that some or all plaintiffs are not grandfathered and do not qualify for the exemption, they are protected by the safe harbor pending the forthcoming further accommodations.  And plaintiffs need not determine whether they qualify for the exemption in order

*Catholic Diocese of Nashville*, 2012 WL 5879796, at *4; *Belmont Abbey*, 2012 WL 2914417, at *10.

Finally, plaintiffs cannot transform the speculative (and highly unlikely) possibility of future injury (i.e., that the regulations in their current form might be enforced against plaintiffs in the future) into a current concrete injury for standing purposes by vaguely suggesting that they have to plan now for future needs. *See, e.g.*, Compl. ¶¶ 118, 120. Such reasoning would deprive standing doctrine of all force and sap the imminence requirement of all meaning, since a plaintiff could simply manufacture standing by asserting a current need to prepare for the most remote and ill-defined harms. *See Nw. Airlines, Inc. v. FAA*, 795 F.2d 195, 201 (D.C. Cir. 1986); *ViroPharma, Inc. v. Hamburg*, 777 F. Supp. 2d 140, 147 & n.3 (D.D.C. 2011) (holding that "'uncertainties' regarding the future regulatory . . . environment" and their impact on an entity's "strategic planning" are "highly nebulous in both character and degree, and are a far cry from the type of concrete and particularized injury required for Article III standing" and noting that such uncertainty "only highlights the speculative nature of any future injury"). Such a

---

to benefit from the safe harbor. *See* Guidance at 4. Thus, any claim of injury from the need to determine whether the exemption applies is certainly not imminent.

result cannot be reconciled with the Supreme Court's admonition that the threatened injury must be "certainly impending." *Whitmore*, 495 U.S. at 158; *see Zubik*, 2012 WL 5932977, at *11-12 (rejecting similar alleged planning injuries).

Even if such manipulation were not so transparent, plaintiffs still would bear the burden of pleading standing with specificity. *Ashcroft v. Iqbal*, 556 U.S. 662, 667-68 (2009); *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009). Plaintiffs do not meet that burden here because they do not explain how uncertainty regarding how and whether the regulations will apply to them has purportedly injured their ability to plan for the future. *See* Compl. ¶¶ 118-20. Moreover, any planning plaintiffs are engaged in "stems not from the operation of [the preventive services coverage regulations], but from [plaintiffs'] own . . . personal choice[s]" to prepare for contingencies that may never occur. *McConnell*, 540 U.S. at 228. Thus, even if this preparation were an injury, it would not be fairly traceable to the challenged regulations. *See Lujan*, 504 U.S. at 560.

Accordingly, this case should be dismissed in its entirety for lack of standing.

## II.    THE COURT SHOULD DISMISS THIS CASE FOR LACK OF JURISDICTION BECAUSE IT IS NOT RIPE

"The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003) (quotation omitted).  It "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Id*. at 807.  It also "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id*. at 807-08; *see also, e.g.*, *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1174 (11th Cir. 2006).

A case ripe for judicial review cannot be "nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 244 (1952).  As the Eleventh Circuit has explained, "[t]he central concern [of the ripeness doctrine] is whether the case involves uncertain and contingent future events that may not occur as anticipated, or indeed may not occur

at all." *Warner Cable Commc'ns, Inc. v. City of Niceville*, 911 F.2d 634, 642 (11th Cir. 1990) (brackets in original).  In assessing ripeness, courts evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds in Califano v. Sanders*, 430 U.S. 99, 105 (1977); *see also Ouachita Watch League*, 463 F.3d at 1174.

The Supreme Court discussed these two prongs of the ripeness analysis in *Abbott Laboratories*, the seminal case on pre-enforcement review of agency action. 387 U.S. 136.  In that case, the Court found the fitness prong to be satisfied where regulations were "quite clearly definitive," *id*. at 151; the regulations "were made effective immediately upon publication," *id*. at 152; and "[t]here [was] no hint that th[e] regulation[s] [were] informal . . . or tentative," *id*. at 151.  Moreover, the Court noted that "the issue tendered [was] a purely legal one" and there was no indication that "further administrative proceedings [were] contemplated." *Id*. at 149.  The Court therefore was not concerned that judicial intervention would inappropriately interfere with further administrative action.  The Court also found the hardship prong to be satisfied where regulations "require[d] an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties

26

attached to noncompliance," such that plaintiffs faced the "dilemma" of complying and incurring the attendant costs or not complying and "risk[ing] serious criminal and civil penalties." *Id*. at 152-53 (quotation omitted).

None of the indicia of ripeness discussed in *Abbott Laboratories* is present in this case. Plaintiffs seek judicial review now of the preventive services coverage regulations as applied to non-grandfathered religious organizations that object to certain contraceptive coverage for religious reasons, but defendants have initiated a rulemaking to amend the regulations to accommodate the concerns expressed by organizations like plaintiffs, and have made clear that the amendments will be finalized well before the earliest date on which the challenged regulations could be enforced by defendants against plaintiffs. 77 Fed. Reg. at 8728-29. Therefore, unlike in *Abbott Laboratories* – where the challenged regulations were definitive and no further administrative proceedings were contemplated – the preventive services coverage regulations are certain to be amended. Because the forthcoming amendments will eliminate the need for judicial review entirely, or at least narrow and refine the controversy, review would therefore "waste[] the court's time and interfere[] with the process by which the agency is attempting to reach a final decision." *Cont'l Airlines, Inc. v. Civil*

27

*Aeronautics Bd.*, 522 F.2d 107, 125 (D.C. Cir. 1975) (en banc); *see Zubik*, 2012 WL 5932977, at *8; *Catholic Diocese of Nashville*, 2012 WL 5879796, at *5; *Wheaton*, 2012 WL 3637162, at *8; *Belmont Abbey*, 2012 WL 2914417, at *12.

Moreover, the forthcoming amendments are intended to address the very issue that plaintiffs raise here by establishing alternative means of providing contraceptive coverage without cost-sharing while accommodating religious organizations' religious objections to covering contraceptive services. And plaintiffs have had, and will continue to have, opportunities to participate in the rulemaking process and to provide comments and/or ideas regarding the proposed accommodations. There is, therefore, a significant chance that the amendments will alleviate altogether the need for judicial review, or at least narrow and refine the scope of any actual controversy. *See Occidental Chem. Corp. v. FERC*, 869 F.2d 127, 129 (2d Cir. 1989) ("[T]he rulemaking process, with its public comments, may lead to new factual information that will inform the Commission's final decision."); *see also Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (quotations omitted)); *Warner Cable Commc'ns*, 911 F.2d at 642 (same).

28

Once the forthcoming amendments are finalized, if plaintiffs' concerns are not laid to rest, plaintiffs "will have ample opportunity [] to bring [their] legal challenge at a time when harm is more imminent and more certain." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998); *see also Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387-89 (D.C. Cir. 2012) (concluding challenge to regulation was not ripe where agency had initiated a rulemaking that could significantly amend the regulation); *Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*, 413 F.3d 479, 483-84 (5th Cir. 2005) (dismissing challenge to rule as unripe where agency deferred effective date of rule and announced its intent to consider issues raised by plaintiff in new rulemaking during the deferral period); *Wilderness Soc'y v. Alcock*, 83 F.3d 386, 390-91 (11th Cir. 1996) ("Until such actions have been proposed, however, there is no controversy for us to resolve. . . .  We do not yet know when or how an injury . . . will occur, and this factual underpinning is vital to a full-fledged judicial review."); *Occidental Chem. Corp.*, 869 F.2d at 129 ("[T]he pending rulemaking process makes the stayed April 14, 1988 order particularly inappropriate for judicial resolution at this time because the rulemaking could alter the very regulations applied in that order.") (internal citation and quotation omitted); *Lake Pilots Ass'n v. U.S. Coast Guard*, 257 F.

Supp. 2d 148, 160-62 (D.D.C. 2003) (holding challenge to rule was not ripe where agency undertook a new rulemaking to address issue raised by plaintiff).[13]

Further, although plaintiffs' Complaint raises largely legal claims, those claims are leveled at regulations that, as applied to plaintiffs and similarly-situated organizations, have not "taken on fixed and final shape." *Pub. Serv. Comm'n*, 344 U.S. at 244; *see also Pittman v. Cole*, 267 F.3d 1269, 1278-80 (11th Cir. 2001) ("The ripeness doctrine is designed to prevent federal courts from engaging in such speculation and prematurely and perhaps unnecessarily reaching constitutional issues."); *Bethlehem Steel Corp. v. EPA*, 536 F.2d 156, 161 (7th Cir. 1976) ("[T]he issues here are fit for judicial review in the sense that they present concrete legal questions, but are not fit for judicial review in the sense that the actions challenged are part of a continuing agency decision-making process which has not yet resulted in an order requiring compliance by the petitioners."); *Wheaton*, 2012 WL 3637162, at *8; *Belmont Abbey*, 2012 WL 2914417, at *14.  Once defendants

---

[13] As it did with regard to standing, *supra* note 11, the court in *Archdiocese of New York* rejected defendants' ripeness arguments because it concluded that the regulations are "quite clearly definitive," 2012 WL 6042864, at *21, even though, as every other court to examine this issue has held, defendants' repeated, clear, and ongoing commitment to amending those regulations means plaintiffs' challenge is not ripe.

complete the rulemaking outlined in the ANPRM, plaintiffs' challenge to the current regulations likely will be moot.  *See Toca Producers v. FERC*, 411 F.3d 262, 266 (D.C. Cir. 2005) (rejecting purely legal claim as unripe due to the possibility that it may not need to be resolved by the courts).  And judicial review of any future amendments to the regulations that result from the pending rulemaking would be too speculative to yield meaningful review.

The ANPRM offers ideas and solicits input on potential, alternative means of achieving the goals of providing women access to contraceptive services without cost-sharing and accommodating religious organizations' liberty interests, 77 Fed. Reg. at 16,503, but it certainly does not preordain what amendments to the preventive services coverage regulations defendants will ultimately promulgate or foreclose the possibility that defendants will adopt alternative proposals not set out in the ANPRM.  Thus, review of any of the suggested proposals contained in the ANPRM would only entangle the Court "in abstract disagreements over administrative policies."  *Abbott Labs.*, 387 U.S. at 148; *see also Pittman*, 267 F.3d at 1278; *Bethlehem Steel Corp.*, 536 F.2d at 160-61; *Tex. Indep. Producers*, 413 F.3d at 482; *Lake Pilots Ass'n*, 257 F. Supp. 2d at 160.  Because judicial review at this time would inappropriately interfere with defendants' pending rulemaking and

may result in the Court deciding issues that might never arise, this case is not fit for judicial review.  *See Zubik*, 2012 WL 5932977, at *10 n.15; *Catholic Diocese of Nashville*, 2012 WL 5879796, at *5; *Wheaton*, 2012 WL 3637162, at *7-8; *Belmont Abbey*, 2012 WL 2914417, at *11-14.

Withholding or delaying judicial review also would not result in any hardship for plaintiffs.  Unlike the plaintiffs in *Abbott Laboratories*, plaintiffs here are not being compelled to make immediate and significant changes to their day-to-day operations.  As explained above, because plaintiffs concede their health plans are grandfathered, Compl. ¶ 44, those plans are not required to cover contraceptive services.  Moreover, even if their plans were not grandfathered, plaintiffs would still face no imminent enforcement action by defendants because of the safe harbor and the forthcoming amendments to the regulations.  *See Corey H. v. Bd. of Educ. of Chicago*, 534 F.3d 683, 688-89 (7th Cir. 2008).  Plaintiffs allege (without specificity) that they "must consult and negotiate with their third-party administrators" and that this "requires a substantial amount of time," Compl. ¶¶ 118, 120, but these allegations do not demonstrate a "direct and immediate" effect on plaintiffs' "day-to-day business" with "serious penalties [including criminal penalties] attached to noncompliance," as required to establish hardship.

*Abbott Labs.*, 387 U.S. at 152-53; *see also Rock Energy Coop. v. Vill. of Rockton*, 614 F.3d 745, 749 (7th Cir. 2010) ("[N]or does the record show how the threat of future enforcement is having a present concrete, adverse, and irremediable effect on Rock Energy's day-to-day affairs.").

Furthermore, the events for which plaintiffs are allegedly planning are just too speculative to qualify as a hardship for ripeness purposes. *See Cephalon, Inc. v. Sebelius*, 796 F. Supp. 2d 212, 218 (D.D.C. 2011) ("Plaintiff cannot base an argument of undue burden from postponement of a judicial decision on its having to plan for a future event, as opposed to the actual event, if that event is too speculative in the first instance."). Plaintiffs' alleged desire to plan for contingencies that may or may not arise in the future does not constitute a hardship; if it did, the hardship prong would become meaningless because organizations are always planning for the future. *See Bethlehem Steel Corp.*, 536 F.2d at 162 ("[C]laims of uncertainty in [plaintiff's] business and capital planning are not sufficient to warrant [] review of an ongoing administrative process."); *Wilmac Corp. v. Bowen*, 811 F.2d 809, 813 (3d Cir. 1987); *Tenn. Gas Pipeline Co. v. F.E.R.C.*, 736 F.2d 747, 751 (D.C. Cir. 1984); *Cephalon*, 796 F. Supp. 2d at 218. Finally, that alleged hardship arises, not from the challenged regulations, *see*

*Abbott Labs.*, 387 U.S. at 152, but from plaintiffs' own desires to prepare for a hypothetical situation in which the forthcoming amendments do not sufficiently address their concerns.

Faced with substantially similar allegations, the courts in *Zubik*, *Catholic Diocese of Nashville*, *Wheaton*, *Belmont Abbey*, and *Nebraska* all concluded that the plaintiffs had not demonstrated hardship from delayed review. *Belmont Abbey*, 2012 WL 2914417, at *14 ("Costs stemming from Plaintiff's desire to prepare for contingencies are not sufficient . . . to constitute a hardship for purposes of the ripeness inquiry – particularly when the agency's promises and actions suggest the situation Plaintiff fears may not occur."); *see Zubik*, 2012 WL 5932977, at *10 n.15; *Catholic Diocese of Nashville*, 2012 WL 5879796, at *5; *Wheaton*, 2012 WL 3637162, at *8; *Nebraska*, 2012 WL 2913402, at *23.

In sum, nothing in the Complaint suggests that plaintiffs' employee health plans are not grandfathered or cannot qualify for the temporary enforcement safe harbor, meaning that defendants would not take any enforcement action against plaintiffs for failure to cover contraceptive services, if ever, at least until January 1, 2014 in the case of the Atlanta Plan, and July 1, 2014 in the case of the Savannah Plan. *See* Guidance at 3. And, by the time the enforcement safe harbor expires,

defendants will have finalized further amendments to the preventive services coverage regulations to further accommodate religious organizations' religious objections to providing contraceptive coverage.  *See* 77 Fed. Reg. at 8728-29.  This is thus not a case where plaintiffs must choose between forgoing lawful activity and risking legal sanctions.  *See Abbott Labs.*, 387 U.S. at 153.  Indeed, "[w]ere [this Court] to entertain [the] anticipatory challenge[] pressed by [plaintiffs]" – parties "facing no imminent threat of adverse agency action, no hard choice between compliance certain to be disadvantageous and a high probability of strong sanctions" – the Court "would venture away from the domain of judicial review into a realm more accurately described as judicial preview," a realm into which the Court ought not tread.  *Tenn. Gas Pipeline Co.*, 736 F.2d at 751 (internal citation omitted).

Because plaintiffs' challenge to the regulations is not fit for judicial decision and because plaintiffs would not suffer substantial hardship if review were withheld or delayed, this case should be dismissed in its entirety as unripe.

## **CONCLUSION**

For all the foregoing reasons, this Court should grant defendants' motion to dismiss plaintiffs' Complaint.

Respectfully submitted this 10th day of December, 2012,

STUART F. DELERY
Principal Deputy Assistant Attorney General

IAN HEATH GERSHENGORN
Deputy Assistant Attorney General

SALLY QUILLIAN YATES
United States Attorney

JENNIFER RICKETTS
Director

SHEILA M. LIEBER
Deputy Director

_/s/ Michelle R. Bennett_____
MICHELLE R. BENNETT (CO Bar No. 37050)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W. Room 7306
Washington, D.C. 20530
Tel: (202) 305-8902
Fax: (202) 616-8470
Email: michelle.bennett@usdoj.gov

*Attorneys for Defendants*

36

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notice of such filing to all parties.

_/s/ Michelle R. Bennett _____
MICHELLE R. BENNETT

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the documents to which this certificate is attached have been prepared with one of the font and point selections approved by the Court in Local Rule 5.1C for documents prepared by computer.

_/s/ Michelle R. Bennett _____
MICHELLE R. BENNETT