# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| R. DANIEL CONLON, BISHOP OF THE ROMAN CATHOLIC DIOCESE OF JOLIET, ILLINOIS, as Successor Trustee Under the Provisions of the Trust Agreement Dated December 31, 1949; CATHOLIC CHARITIES DIOCESE OF JOLIET, INC; THE MOST REVEREND THOMAS JOHN PAPROCKI, ROMAN CATHOLIC BISHOP OF SPRINGFIELD-IN-ILLINOIS; CATHOLIC CHARITIES OF THE DIOCESE OF SPRINGFIELD-IN-ILLINOIS; CATHOLIC CHARITIES OF THE ARCHDIOCESE OF CHICAGO; and SAINT PATRICK HIGH SCHOOL,<br><br>        Plaintiffs,<br><br>    v.<br><br>KATHLEEN SEBELIUS, in her official capacity as Secretary of the U.S. Department of Health and Human Services; HILDA SOLIS, in her official capacity as Secretary of the Department of Labor; TIMOTHY GEITHNER; in his official capacity as Secretary of the U.S. Department of the Treasury; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF LABOR; and U.S. DEPARTMENT OF TREASURY,<br><br>        Defendants. | Case No. 12-cv-3932<br><br>Judge John W. Darrah |

**MEMORANDUM OPINION AND ORDER**

On August 8, 2012, Plaintiffs filed an Amended Complaint, alleging nine separate counts against Defendants with regards to the enactment and enforcement of the Patient Protection and Affordable Care Act of 2010 ("ACA"). Plaintiffs assert that because they are Catholic, religious entities and employers, the requirements of the ACA to provide contraceptive, sterilization, and abortion services to employees violate Plaintiffs' sincerely held religious beliefs. (Am. Compl. ¶¶ 2-5.) Specifically, Plaintiffs allege Defendants, in the enactment and enforcement of the ACA, violate the Religious Freedom Restoration Act, the First Amendment of the U.S. Constitution, and the Administrative Procedure Act. (Am. Compl. ¶¶ 200-304.) Defendants move to dismiss Plaintiffs' Amended Complaint for lack of subject-matter jurisdiction, arguing Plaintiffs lack standing, and that the matter is not ripe for adjudication. For the reasons presented below, Defendants' Motion to Dismiss is granted, and the Amended Complaint is dismissed without prejudice.

## BACKGROUND

The instant action is one of many filed across the country, challenging the legality of the ACA's regulations regarding contraception and preventative care. In granting a similar motion to dismiss on the basis of standing and ripeness, Judge Boasberg of the District of D.C. provided a detailed explanation of the statutory history. *See Belmont Abbey College v. Sebelius*, 878 F. Supp. 2d 25 (D.D.C. 2012) (*Belmont Abbey*). The United States Department of Health and Human Services enlisted the guidance of the Institute of Medicine, a private health policy organization, to establish guidelines regarding preventative health care for the Health Resources and Services Administration

2

("HRSA"). The Institute of Medicine suggested, among other proposals, that insurance plans be required to cover contraceptives and sterilization procedures, including emergency contraceptives, such as the "morning-after" pill. *Id.* at 29. HRSA adopted these proposed guidelines; and, on August 1, 2011, the Department of Health and Human Services, the Department of Labor, and the Department of Treasury ("the Departments") issued an interim final rule, requiring group insurance plans to cover the preventative services for women suggested by the Institute of Medicine. *Id*. at 29-30 (quoting 76 Fed. Reg. 46621; 45 C.F.R. § 147.130). According to the federal regulation, all insurance plans and policies, unless specifically exempt, must provide women coverage for contraceptive services, beginning on August 1, 2012, without any cost-sharing requirements. *Id*.

The Departments acknowledged the impact on the religious beliefs of some religious employers if they were required to cover contraceptive services. *Wheaton College v. Sebelius*, No. 12-1169, 2012 WL 3637162, at *2 (Aug. 24, 2012 D.D.C.) (*Wheaton College*). The interim final rule gave exemption to certain employers, including churches or religious orders, and other employers that meet the following criteria:

> (1) The inculcation of religious values is the purpose of the organization. (2) The organization primarily employs persons who share the religious tenets of the organization. (3) The organization serves primarily persons who share the religious tenets of the organization. (4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

45 C.F.R. § 147.130(a)(1)(iv)(B). The Departments invited comments to the interim

3

final rule, specifically with regards to the definition of religious employer, described above. In response to the comments received, the Departments stated the following:

> [T]he Departments are adopting the definition in the amended interim final regulations for purposes of these final regulations while also creating a temporary enforcement safe harbor, discussed below. During the temporary enforcement safe harbor, the Departments plan to develop and propose changes to these final regulations that would meet two goals—providing contraceptive coverage without cost-sharing to individuals who want it and accommodating non-exempted, non-profit organizations' religious objections to covering contraceptive services . . . .

77 Fed. Reg. 8725. The rule provides a one year "safe harbor" by which "certain non-exempted, non-profit organizations with religious objections to covering contraceptive services" will not be held to be in violation of the regulations for failing to cover contraceptive services.[1] 77 Fed. Reg. 8728. The safe harbor remains in effect "until the

---

[1] To qualify for the safe harbor, an organization must meet the following criteria:

1. The organization is organized and operates as a non-profit entity.

2. From February 10, 2012 onward, the group health plan established or maintained by the organization has consistently not provided all or the same subset of the contraceptive coverage otherwise required at any point, consistent with any applicable State law, because of the religious beliefs of the organization.

3. As detailed below, the group health plan established or maintained by the organization (or another entity on behalf of the plan, such as a health insurance issuer or third-party administrator) must provide to participants the attached notice, as described below, which states that some or all contraceptive coverage will not be provided under the plan for the first plan year beginning on or after August 1, 2012.

4. The organization self-certifies that it satisfies criteria 1-3 above, and documents its self-certification in accordance with the procedures detailed herein.

U.S. Department of Health and Human Services, Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers, at 3 (Aug. 15, 2012), *available at*

4

first plan year that begins on or after August 1, 2013." *Belmont Abbey*, 878 F. Supp. 2d at 31 (citation omitted). During the safe harbor period, the Departments intend to "develop alternative ways of providing contraceptive coverage without cost sharing with respect to non-exempted, non-profit religious organizations with religious objections to such coverage." 77 Fed. Reg. 8728. On March 21, 2012, the Departments issued an "Advance Notice of Proposed Rulemaking," or "ANPRM," whereby the Departments formally declared their intention to amend the final regulations, and invited additional comments from the public and interested parties. *See* 77 Fed. Reg. 16,501; *Belmont Abbey*, 878 F. Supp. 2d at 31. The Departments intend to finalize such amendments to the final regulations prior to the end of the safe harbor period, August 1, 2013. 77 Fed. Reg. 16,503.

"Plaintiffs are Catholic religious entities that provide a wide range of spiritual, educational, and social services" to Illinois residents, without regard to an individual's religious beliefs. (Am. Compl. ¶ 2.) Plaintiffs Diocese of Joliet and Diocese of Springfield state they do not know if they will qualify as a "religious employer" under the federal regulations. (Am. Compl. ¶ 6.) Plaintiffs further state that Diocese of Springfield's and Catholic Charities Springfield's health plan is grandfathered and that those Plaintiffs are injured by their inability to change their plan as they see fit. (Resp. at 5.) All Plaintiffs allege that the enactment of the federal regulations regarding coverage of preventative care would force Plaintiffs "to provide, pay for, and/or facilitate access to abortion-inducing drugs, sterilization, and contraception, or [require] Plaintiffs to submit

---

http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf.

to an intrusive governmental examination of their religious missions." (Am. Compl. ¶ 8.)

Defendants move to dismiss Plaintiffs' Amended Complaint, asserting that Plaintiffs' suit should be dismissed for lack of subject-matter jurisdiction, because Plaintiffs fail to allege an imminent injury, required to establish standing. Defendants further contend that the case is not yet ripe for judicial review.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) allows a party to raise as a defense, by motion, a federal court's lack of subject-matter jurisdiction. "When reviewing a dismissal for lack of subject-matter jurisdiction . . . the district court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007) (quoting *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999)). However, when a defendant challenges subject-matter jurisdiction, the plaintiff bears the burden of establishing jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (*Lujan*).

A challenge of standing is a challenge to a court's subject-matter jurisdiction; standing is an essential jurisdictional requirement. To establish standing, a plaintiff must show: a violation of a concrete, particularized legally protected interest; a causal relationship between the defendant's conduct and the injury to the plaintiff, and an injury which can be redressed if a court finds in the plaintiff's favor. *Lujan*, 504 U.S. at 560-61. The nonmoving party must support the basis of the jurisdiction with competent proof of jurisdictional facts. *Kontos v. U.S. Dep't of Labor*, 826 F.2d 573, 576 (7th Cir. 1987).

6

"When considering a motion that launches a factual attack against jurisdiction, '[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (citations omitted). In establishing standing, a plaintiff must demonstrate the threat of an "'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical." *American Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)) (citations omitted). Without a certainly impending injury, standing does not exist. *Sierra Club v. Marita*, 46 F.3d 606, 611 (7th Cir. 1995) (citing *Lujan*, 504 U.S. 564; *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (*Whitmore*)).

Challenges to standing may be made prior to the enforcement of a law. The "existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as 'injury' for the purpose of standing." *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010) (citations omitted) (*Bauer*).

A case may be challenged on the issue of ripeness, which, like the issue of standing, stems from the U.S. Constitution's case-or-controversy requirement. Concerns of whether or not a case is ripe for adjudication can "arise when a case involves uncertain or contingent events that may not occur as anticipated, or not occur at all." *Wisconsin Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011)

7

(*Barland*). In determining if an issue is ripe for adjudication, a court considers: (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Id.* (citing *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983)).

## ANALYSIS

### Standing

Defendants contend Plaintiffs lack the requisite standing to pursue their claims because they do not allege an imminent injury resulting from the ACA and related federal regulations. Specifically, Defendants argue that because of the safe harbor provision, "Defendants will not take any enforcement action against an organization that qualifies for safe harbor until the first plan year that begins on or after August 1, 2013." (Mem. in Support of Defs.' Mot. at 10.) However, standing is not vitiated simply because the harm is not immediate, but rather likely to occur in the near future. "Standing depends on the probability of harm, not its temporal proximity." *520 S. Michigan Ave. Associates, Ltd. v. Devine*, 433 F.3d 961, 962 (7th Cir. 2006) (*520 S. Michigan Ave.*) (further noting "Courts frequently engage in pre-enforcement review based on the potential cost that compliance (or bearing a penalty) creates."). The mere fact Plaintiffs are perhaps not harmed *today* does not destroy the parties' standing; it is enough for Plaintiffs to demonstrate the probability of harm in the future. *See Bauer*, 620 F.3d at 708. The safe harbor provision, on its face, simply delays the enforcement of the contraceptive provisions as to Plaintiffs; the provision does not "reduce the certainty of the impending injury." *Belmont Abbey*, 878 F. Supp. 2d at 35.

8


Though the safe harbor does not eliminate the possibility of an imminent injury for purposes of standing, the ANPRM issued on March 21, 2012, *does* impact the likely imminence of Plaintiffs' injuries. The Government, in the ANPRM, made clear its intent to amend the regulations to address concerns, like that of Plaintiffs', regarding employers with religious objections to contraception. 77 Fed. Reg. 16,501. The ANPRM further provided that such amendments would be implemented prior to the end of the safe harbor provision. *Id.* Moreover, government agencies are entitled to the presumption that they act in good faith, and no evidence has been presented to indicate the Departments will renege on the statements made regarding amendment in the ANPRM. *See Starr v. Federal Aviation Administration*, 589 F.2d 307, 315 (7th Cir. 1978). With an amendment to the final regulations forthcoming, Plaintiffs' alleged injuries regarding the enforcement of the current regulations are not "certainly impending." *Belmont Abbey*, 878 F. Supp. 2d at 37 (quoting *Whitmore*, 495 U.S. at 158.).

However, Plaintiffs also allege that, beyond the future impact at the expiration of the safe harbor, the regulations also create present injuries. Specifically, Plaintiffs argue that the current regulations impact their ability to plan their future budgets, contending that "if Plaintiffs are to comply with the law at the end of the safe harbor, they must begin taking compliance measures *now* or bear the risk of being unprepared." (Resp. at 10) (emphasis in original). In support of this position, Plaintiffs rely in part upon the Seventh Circuit's ruling in *520 S. Michigan Ave.* However, *520 S. Michigan Ave.* is readily distinguishable from the facts at issue here. In *520 S. Michigan Ave.*, an employer believed a credible threat of criminal prosecution existed if it failed to comply

9

with a law, and no promises were made regarding the non-enforcement of the law. *520 S. Michigan Ave.*, 433 F.3d at 963-64. Here, the Government has clearly indicated that the present regulations will be amended. Therefore, any present injuries incurred by Plaintiffs as a result of their planning for the future, in response to regulations they know will be amended, are of their own making. Plaintiffs assert that the possibility of a change (or lack thereof) in a regulation causes Plaintiffs immediate harm, because that possibility affects their ability to plan for the future. Those claims of present injury are remote and based in conjecture; the claims do not establish an actual, concrete harm required to confer standing to Plaintiffs. *See Lujan*, 504 U.S. at 560.

Thus, Defendants' Motion to Dismiss the Amended Complaint for lack of subject-matter jurisdiction on the basis of standing is granted.

*Ripeness*

Furthermore, Plaintiffs' claims are not ripe for adjudication. The ripeness doctrine prevents a court from engaging in a premature adjudication of an issue, particularly when an administrative decision is not yet final. *See National Park Hospitality Association v. Department of the Interior*, 538 U.S. 803, 807-808 (2003) (*National Park*). The doctrine prevents courts "from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–149 (1967) *overruled on other grounds* (*Abbott Labs*); *Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

10

In determining if an issue is ripe for adjudication, a court considers: (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *National Park*, 538 U.S. at 808. Defendants argue Plaintiffs' claims are not yet ripe because the promised accommodations regarding religious objections mean the current regulations are not truly final, rendering any judicial decision as to the legality of the current regulations premature. Plaintiffs counter that the regulations are "final rules" and, therefore, fit for pre-enforcement review. However, Plaintiffs' position ignores the reality that the Government stated its intention in the ANPRM to amend the regulations and that the Government further represented the amendment was impending at oral argument. Hence, it is possible that the forthcoming amendments will eliminate the need for judicial review or, at the very least, impact the scope of Plaintiffs' claims. The ANPRM demonstrates that the challenged regulations are not "sufficiently final" and, therefore, Plaintiffs' claims are not ripe for judicial review. *See Belmont Abbey*, 878 F. Supp. 2d at 39.

Likewise, the hardship to Plaintiffs if the Court does not adjudicate their claims is insufficient to overcome the requirement that the claims be fit for final review. As discussed above, Plaintiffs argue they cannot properly plan for the future, particularly with regards to their budgets, due to the current state of the regulations. However, their claims of uncertainty do not meet the hardship requirement necessary to make their claims ripe for adjudication. The current regulations, considering the forthcoming amendments, do not have a direct impact on Plaintiffs' day-to-day operations, despite Plaintiffs' allegation that the current regulations somehow already inhibit their ability to

11

Case 1:12-cv-03489-WSD Document 42-1 Filed 02/14/13 Page 13 of 13

hire employees, attract students, and solicit charitable contributions. (Am. Compl. ¶ 164.) *See Bethlehem Steel Corp. v. EPA*, 536 F.2d 156, 162-163 (7th Cir. 1976) (finding plaintiffs' "claims of uncertainty in their business and capital planning are not sufficient to warrant our review of an ongoing administrative process. . . . the claims are vague and speculative."). The necessity to postpone judicial review of Plaintiffs' claims until the Departments have finalized the amended regulations outweighs the purported hardship to Plaintiffs in their ability to plan for contingencies. *See Belmont Abbey*, 878 F. Supp. 2d at 41.

Therefore, in addition to failing to assert standing necessary to establish subject-matter jurisdiction, the claims alleged by Plaintiffs are unripe for adjudication.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction [31] is granted, and Plaintiff's Complaint is dismissed without prejudice. The merits of the current preventative care regulations or proposed amended regulations cannot be reached.

Date: February 8, 2013

JOHN W. DARRAH
United States District Court Judge