**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **THE ROMAN CATHOLIC ARCHDIOCESE OF ATLANTA,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **1:12-cv-03489-WSD** |
| **KATHLEEN SEBELIUS, in her official capacity as Secretary, United States Department of Health and Human Services,** *et al.*, | |
| **Defendants.** | |

## OPINION AND ORDER

This matter is before the Court on the Plaintiffs' Motion for Preliminary Injunction [57], the Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment [64], and the Plaintiffs' Motion for Summary Judgment [78].

## I.   BACKGROUND

### A.   Facts

#### 1.   The Plaintiffs

Plaintiff the Roman Catholic Archdiocese of Atlanta ("Atlanta Archdiocese") is an association of parishes and other entities located within the 69 counties of northern Georgia.  Compl. at 13.  Plaintiff the Most Reverend Wilton D. Gregory is the Archbishop of the Atlanta Archdiocese ("Archbishop Gregory").  Id. at 15.  The Atlanta Archdiocese provides spiritual, educational and social services to Catholics in northern Georgia.  Id. at 16.  The Atlanta Archdiocese directly operates 18 Catholic schools.  Id.  Plaintiff Catholic Education of North Georgia, Inc. ("CENGI") executes the Atlanta Archdiocese's educational mission through five independent Catholic schools in the region and is separately incorporated as a non-profit entity.  Id.  The Catholic schools educate nearly 12,000 students and employ more than 4,800 teachers and administrators.  Id.

Plaintiff Catholic Charities of the Archdiocese of Atlanta, Inc. ("Catholic Charities") is a separately incorporated non-profit entity that provides social services, including refugee resettlement advice, immigration counseling, mental health counseling, financial literacy education, marriage counseling, and a pregnancy support program that counsels women regarding in-home parenting

2

education, pregnancy support services, post-adoption services, and play therapy for children. Id. at 17-18. CENGI and Catholic Charities employ and provide services to Catholics and non-Catholics alike.[1] Id.

Plaintiff the Roman Catholic Diocese of Savannah ("Savannah Diocese") is an association of 55 parishes and 24 missions in southern Georgia. Id. at 18-19. Plaintiff Bishop Hartmayer carries out the spiritual, educational and social services mission of the Savannah Diocese. Id. The Savannah Diocese provides social services and operates 16 elementary schools, five high schools, and several preschool programs. Id. at 19. The Catholic schools operated by the Savannah Diocese educate nearly 5,000 students, a third of whom are not Catholics. Id.

The "sanctity of human life and the dignity of all persons" are central to the Catholic faith. Plaintiffs' Statement of Undisputed Material Facts and Additional Statement of Facts at 8 ("PSMF").[2] Plaintiffs believe that "human life must be

---

[1] The Atlanta Archdiocese, Archbishop Gregory, CENGI and Catholic Charities are sometimes collectively referred to as the "Atlanta Plaintiffs" in this Order.

[2] Despite the fact that the Court generously allowed the parties to file excess briefs, both sides have utilized their Statement of Material Facts and/or Responses as vehicles to rehash the same arguments raised in their briefs. The Court disregards the parties' Statement of Material Facts to the extent that the statements are argumentative or contrary to the record established in this case. See LR 56.1(B), NDGa.; Bozeman v. Per-Se Tech. Inc., 456 F. Supp. 2d 1282, 1295-97 (N.D. Ga. 2006). A party's response to the other party's Statement of Material Facts is also

respected and protected absolutely from the moment of conception." Id. at 9.  The

Catholic faith prohibits any action that "'renders procreation impossible.'" Id.

The Church considers "'[e]very procedure whose sole immediate effect is the

termination of pregnancy before viability [as] an abortion, which, in its moral

context, includes the interval between conception and implantation of the

embryo.'" Id. at 10.  As such, Plaintiffs' religion prohibits them from providing,

subsidizing or facilitating abortion-inducing drugs, artificial contraceptives,

sterilization services and counseling or education related to these categories of

products or services. Id. at 8.[3]  Artificial contraceptives and sterilization

procedures have historically been excluded from health plans sponsored by the

Atlanta Archdiocese and the Savannah Diocese. Id. at 10-11.  A health insurance

plan that provides coverage for artificial contraceptives or sterilization procedures

violates the Plaintiffs' religious beliefs. Id. at 10.

---

disregarded, and the facts are deemed admitted, to the extent that the response is
argumentative or contradictory to the record established in this case. Id.

[3] At ¶ 20, the Plaintiffs state that "Catholic religious teaching prohibits subsidizing,
providing, and/or facilitating coverage for abortion-inducing products, sterilization
services, contraceptives, and related counseling services *in the manner required by
the Mandate*." (emphasis added).  PSMF at 8.  This statement is the crux of the
Plaintiffs' position in this case.  The Statements of Material Facts and Responses
of both sides are riddled with argumentative and conclusory statements, and the
Court disregards them for this reason.

## 2. *The Health Plans*

The Atlanta Archdiocese provides health insurance benefits to nearly 1,530 employees and their 1,070 dependants through the Roman Catholic Archdiocese of Atlanta Group Health Plan ("Atlanta Plan"). <u>Id.</u> at 2. The Atlanta Plan also provides health insurance benefits to the employees of Plaintiff CENGI and Plaintiff Catholic Charities. <u>Id.</u> at 3. The Atlanta Plan is a self-insured health insurance plan that underwrites its own risk, and directly pays health care providers for costs incurred by its beneficiaries. <u>Id.</u> Meritain Health, a subsidiary of AETNA, serves as the third party administrator ("TPA") of the Atlanta Plan. Compl. at 21.[4] The Atlanta Plan year begins on January 1, 2014. PSMF at 4. The Atlanta Plan excludes coverage for abortion, contraceptives unless used for non-contraceptive purposes, sterilization, and any education and counseling related to these types of benefits. <u>Id.</u> at 4.

The Roman Catholic Diocese of Savannah Group Health Care Plan (the "Savannah Plan") is a self-insured health insurance plan that also underwrites its own risk, and pays health care providers for costs incurred by approximately 384 people employed by the Savannah Diocese (and their 263 dependents). <u>Id.</u> at 6. Meritain Health also serves as the TPA of the Savannah Plan. The Savannah Plan

---

[4] <u>See</u> <u>also</u> http://www.meritain.com/AboutUs

year begins on July 1, 2014.  Id. at 7.  Like the Atlanta Plan, the Savannah Plan excludes coverage for abortion, contraceptives unless used for non-contraceptive purposes, sterilization, and any education and counseling related to these types of benefits.  Id. at 8.[5]

The Atlanta Plan is a "grandfathered" plan that currently is not subject to the requirements of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 ("ACA").  Id. at 3-4.  An insurance plan is grandfathered under the ACA only if it provides almost the same benefits at almost the same costs to its beneficiaries.  75 Fed. Reg. at 41731.  To remain grandfathered, an insurance plan's employer contributions cannot decrease by more than 5% of the cost of coverage in comparison to the employer contributions made as of March, 2010. 26 C.F.R. § 54.9815-1251T(g)(1)(v).  The Atlanta Plan has not increased its employee contributions or employee deductibles in an effort to remain grandfathered under the ACA.  PSMF at 3-4.  The Atlanta Plan's coverage costs have increased by over 14% per year since March 23, 2010, and as a result, the Atlanta Archdiocese has absorbed millions of dollars to maintain its grandfathered status under the ACA, and the Atlanta Archdiocese "may be unable to continue to

---

[5] The Atlanta Plan and the Savannah Plan will sometimes be collectively referred to as the "health plans."

do so without threatening its overall solvency."  Compl. at 23-24.  The Plaintiffs expect that, in 2014, the Atlanta Plan will not be able to maintain its grandfathered status under the ACA.  Id.  The Savannah Plan does not meet the ACA's definition of a grandfathered plan.  PSMF at 6-7.

### 3.  *The Regulations*

Under Section 1001 of the ACA, group health insurance plans and health insurance issuers are required to provide "preventive services" coverage for women, without cost sharing, pursuant to the guidelines drawn by the Health Resources and Services Administration ("HRSA").  Defendants' Statement of Material Facts at 1 ("DSMF").  The Department of Health and Human Services ("HHS") delegated to the Institute of Medicine ("IOM") the responsibility to develop recommendations that implement the ACA's requirement to provide "preventive services" for women.  Id. at 2.  The IOM recommended that under the HRSA guidelines, "preventive services" should include "the full range of [FDA] approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."  Id.  FDA approved contraceptive methods include diaphragms, oral contraceptive pills, emergency

7

contraceptives, including Plan B and Ella[6], intrauterine devices ("IUDs") and sterilization.  Id.; Plaintiffs' Response to Defendants' Statement of Material Facts at 6 ("PRDSM").  On August 1, 2011, the HRSA adopted the IOM's guidelines. DSMF at 3; 78 Fed. Reg. at 39870.  These regulations, put in final form in the 2013 Final Rules, are popularly known as the "contraceptive mandate."

The 2013 Final Rules exempt religious employers from the requirement to provide "preventive services."  The Final Rules define a "religious employer" as "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (a)(3)(A)(iii) of the Internal Revenue Code of 1986, as amended."  45 C.F.R. § 147.131(a).  There is no dispute in this matter that "churches, their integrated auxiliaries, and conventions or associations of churches, and the exclusively religious activities of any religious order" are exempt from the contraceptive mandate.  Id.; DRPSM at 11.  The Atlanta Archdiocese and the Savannah Diocese meet this definition and the contraceptive mandate thus does not apply to them.  The 2013 Final Rules also establish an "accommodation" for group health plans maintained by "eligible organizations." 45 C.F.R. § 147.131(b).  An "eligible organization" covered by a self-insured health plan qualifies for the

---

[6] The Plaintiffs believe that Plan B and Ella are "abortifacients."  The FDA does not define or consider these drugs as abortion-inducing products.  See 62 Fed. Reg. 8610.

accommodation if it satisfies the following requirements:

> (1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 2590.715-2713(a)(1)(iv) on account of religious objections.
>
> (2) The organization is organized and operates as a nonprofit entity.
>
> (3) The organization holds itself out as a religious organization.
>
> (4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (a)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies.

29 C.F.R. § 2590.715-2713A(a)(1)-(4).

There is no dispute in this matter that CENGI and Catholic Charities qualify for the accommodation.  The Final Rules provide that CENGI and Catholic Charities are not required to "contract, arrange, pay, or refer for contraceptive coverage."  78 Fed. Reg. at 39,874.  Instead, CENGI and Catholic Charities must complete a self-certification form stating that they are an "eligible organization," and provide a copy of the form to their TPA.  For self-insured plans, the regulations treat the self-certification "as a designation of the third party administrator [] as plan administrator and claims administrator for contraceptive

benefits pursuant to section 3(16) of ERISA." Id. at 39,879.

The TPA for a self-insured plan is not obligated to "enter into, or remain in, a contractual relationship with the eligible organization to provide administrative services for the plan." Id.  When the TPA of a self-insured plan, however, enters into a contractual relationship with a self-insured plan and receives the self-certification form, the regulations require the TPA to provide preventive services through the eligible organization's self-insured plan "without cost sharing, premium, fee, or other charge to plan participants or beneficiaries, or to the eligible organization or its plan." Id. at 39879-80; 29 C.F.R. § 2590.715-2713A(d).[7]  The TPA is reimbursed for providing or arranging for preventive services with a reduction of the Federally-facilitated Exchange user fees ("FFE") that it is required to pay.[8]  78 Fed. Reg. at 39,880.

A self-insured plan that fails to provide preventive services coverage for women, or a non-exempt organization that fails to execute a self-certification form and deliver the form to its TPA, is subject to a fine of $100 a day for each affected

---

[7] 29 C.F.R. § 2590.715-2713A(b)(2)(i)-(ii) also prohibit the TPA from "imposing a premium, fee, or other charge, or any portion thereof, *directly or indirectly*, on the eligible organization." (emphasis added).

[8] The FFE is the fee required to be paid by TPAs and insurers who participate in the health care exchanges established by the ACA.

beneficiary.  PSMF at 20.  If an eligible organization chooses to avoid the requirement to provide preventive services for women by cancelling its health plan, the eligible organization is subject to an annual penalty of $2,000 per full-time employee.[9]  Id.

The exemptions for religious employers were effective on August 1, 2013, and the accommodation and its related rules went into effect for self-insured plans on January 1, 2014.  PSMF at 7.

B.     Procedural History

On August 19, 2013, the Plaintiffs filed their Second Amended and Recast Verified Complaint ("Second Amended Complaint") against Kathleen Sebelius, in her official capacity as Secretary of the United States Department of Health and Human Services ("Defendant Sebelius"), Thomas Perez, in his official capacity as Secretary of the United States Department of Labor, Jacob J. Lew, in his official capacity as Secretary of the United States Department of the Treasury, the United States Department of Health and Human Services, the United States Department of Labor, and the United States Department of the Treasury (collectively, "the

---

[9] The penalty can be imposed only if at least one of the eligible organization's "full-time employees obtains coverage through the Health Insurance Marketplace and qualifies for a premium tax credit, and would not be liable for taxes under 26 U.S.C. § 4980D."  Defendants' Response to the Plaintiffs' Statement of Material Facts and Additional Facts at 15 ("DRPSMF").

Government").[10]  On August 19, 2013, the Plaintiffs also filed a Motion for Preliminary Injunction seeking to enjoin the Government from enforcing the regulations that require the provision of coverage for preventive care.

The Second Amended Complaint alleges that the contraceptive mandate and the accommodation violate: (1) the Religious Freedom Restoration Act of 1993 ("RFRA"); (2) the Free Exercise Clause of the First Amendment; (3) the Free Speech Clause of the First Amendment; (4) the Establishment Clause of the First Amendment; and (5) the Religion Clauses of the First Amendment.

With respect to the Plaintiffs' Free Speech Claims, the Complaint alleges that the accommodation compels them to engage in speech that enables coverage

---

[10] On August 5, 2012, Plaintiffs filed their original Complaint against the Government.  In February 2012, the Government had adopted a different definition of a "religious employer" under the regulations than the definition adopted in the 2013 Final Rules, and the Government issued a temporary enforcement safe harbor for non-grandfathered group health plans provided by non-profit entities with religious objections to contraceptive coverage that did not meet the definition of "religious employer" under the prior regulations.  During the safe harbor period, the Government revised the regulations, amended the definition of a "religious employer," and established an "accommodation" for non-profit entities with religious objections to contraceptive coverage.  On July 18, 2013, in light of the Government's revised regulations, the Court held a teleconference where the Government agreed to withdraw its Motion to Dismiss the Plaintiffs' First Amended Complaint for Lack of Jurisdiction, and the Plaintiffs agreed to file a Second Amended Complaint.  On July 22, 2013, the Government withdrew its Motion to Dismiss the Plaintiffs' First Amended Complaint for Lack of Jurisdiction.

for artificial contraceptives, and also constitutes a content-based regulation that impermissibly prohibits them from influencing their TPA's decision to provide coverage for artificial contraceptives.

The Complaint alleges that the regulations violate the Establishment Clause because they allow the Government to favor some religious groups over others, and thereby excessively entangle the Government in the affairs of religious groups. With respect to Plaintiffs' claim based on the Religion Clauses of the First Amendment, they allege that the regulations unconstitutionally interfere with the internal decisions of the Atlanta Archdiocese and the Savannah Diocese.

The Plaintiffs also allege that Congress unconstitutionally delegated its legislative authority to HHS because the ACA does not contain standards for the provision of preventive services for women.  Plaintiffs allege that the regulations regarding preventive care violate the APA because the regulations conflict with the Weldon Amendment, which prohibits federal agencies from discriminating against any health care entity on the basis that it does not provide coverage for abortions.

On September 23, 2013, the Government filed its Response in Opposition to the Plaintiffs' Motion for Preliminary Injunction.  The Government also filed its Motion to Dismiss or, in the alternative, for Summary Judgment based on the administrative record, regarding the Plaintiffs' claims related to the Establishment

Clause, the APA, and unconstitutional delegation of legislative power.  On October

21, 2013, the Plaintiffs moved for Summary Judgment on all of their claims raised

in the Second Amended Complaint with the exception of the APA claim, which

now appears to be abandoned.  Also on October 21, 2013, the Plaintiffs filed their

Reply to the Defendants' Response in Opposition to the Plaintiffs' Motion for

Preliminary Injunction.  On November 18, 2013, the Government filed its

Response in Opposition to the Plaintiffs' Motion for Summary Judgment, and its

Reply in support of its Motion to Dismiss or, in the alternative, for Summary

Judgment on the Plaintiffs' claims related to the Establishment Clause, the APA,

and the unconstitutional delegation of legislative power.  On December 4, 2013,

the Plaintiffs filed their Reply to the Government's Response in Opposition to the

Plaintiffs' Motion for Summary Judgment.

## II.   DISCUSSION

### A.   Legal Standards

#### 1.   *Injunctive Relief*

A party seeking preliminary injunctive relief must produce evidence

demonstrating: (1) a substantial likelihood of success on the merits of his claims;

(2) that plaintiff will suffer irreparable injury unless an injunction is issued; (3) that

the threatened injury to plaintiff outweighs any harm the proposed injunction might

14

cause the non-moving party; and (4) that the requested injunction would not be adverse to the public interest.  Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp., 715 F.3d 1268, 1273-74 (11th Cir. 2013).  "In this Circuit, [a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites."  Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

The movant cannot rest on allegations in his pleadings, but must present competent evidence establishing all four requirements for injunctive relief.  See id. If the movant fails to establish one or more of the four requirements, the Court is not required to address the others.  Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994).  The first requirement, that the movant demonstrate a substantial likelihood of success on the merits, is considered the most important of the four.  See Odebrecht, 715 F.3d at 1274 ("Here, as in so many cases, the first question is critical."); Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986) ("Ordinarily the first factor is the most important.").

The standard for a permanent injunction is essentially the same as the standard for a preliminary injunction, except that the movant must show actual success on the merits of his claim.  Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004).  That is, the movant must "establish the fact of the

[constitutional or statutory] violation."  Newman v. Alabama, 683 F.2d 1312, 1319

(11th Cir. 1982).  "He must then demonstrate the presence of two elements:

continuing irreparable injury if the injunction does not issue, and the lack of an

adequate remedy at law."  Id.; see also Alabama v. U.S. Army Corps of Eng'rs,

424 F.3d 1117, 1127-28 (11th Cir. 2005) (listing those three requirements for

obtaining a permanent injunction).

   In their Motion for Summary Judgment, the Plaintiffs converted their

Motion for a Preliminary Injunction into a request for permanent injunctive relief.

The Government does not oppose the Plaintiffs' conversion of their Motion for

Preliminary Injunction into a request for permanent injunctive relief.  Defs.' Mem.

in Opp'n to Pls.' Mot. for Summ. J. at 49-50.  The Government argues, however,

that Plaintiffs are not entitled to permanent injunctive relief.  Id.  Given that there

is no dispute about the standard for injunctive relief to be applied in this matter,

and because the Court addresses the actual merits of the Plaintiffs' statutory and

constitutional claims, the Court applies the standard for a permanent injunction.

   2.   *Summary Judgment*

   A court "shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  Parties "asserting that a fact cannot be or is

genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings."  Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record."  Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007)).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at

1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  <u>Herzog</u>, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

      B.    <u>Analysis</u>

          *1.*    *RFRA*

On January 1, 2013, the Government moved to dismiss the Plaintiffs' Complaint on the grounds that the Plaintiffs lacked Article III standing because they failed to demonstrate an injury-in-fact.  After the promulgation of the Final Rules, the Plaintiffs filed an Amended Complaint, and the Government abandoned its challenge to the Plaintiffs' standing to assert an RFRA claim.  In other "church plan" cases around the country, the Government has belatedly argued that plaintiffs, who provide health insurance to their employees through a self-insured, church sponsored health care plan, do not have standing because complying with the Final Rules does not result in the facilitation of contraceptive products and services, and the Government has no authority to ensure that contraceptive products and services will be provided to the beneficiaries of a church sponsored health care plan.  At least one federal court has accepted the Government's

arguments and found that plaintiffs, who provide their employees with health insurance through a self-insured, church sponsored health care plan do not have standing to challenge the Final Rules.  See Roman Catholic Archbishop of Washington v. Sebelius, No. 13-1441, 2013 WL 6729515, at *24-26 (D.D.C. Dec. 20, 2013).  The Court rejects the Government's arguments that were raised earlier in this case, and that were raised in other church plan cases, and the Court finds that the Plaintiffs have Article III standing to assert an RFRA claim.  A detailed discussion of the Court's reasoning regarding whether the Plaintiffs have demonstrated the requirements for Article III standing to raise an RFRA challenge can be found in Section II(B)(1)(ii) of this Order.

i.      Elements of an RFRA Claim

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof…* "  U.S. Const., Amdt. 1 (emphasis added).  In 1990, the Supreme Court held that the Free Exercise Clause does not prohibit the Government from burdening religious practices through neutral and generally applicable laws.  Employment Div., Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872, 879 (1990).  The decision in Smith significantly impacted previous Supreme Court precedent, particularly its decisions in Sherbert v. Verner,

19

374 U.S. 398 (1963) and <u>Wisconsin v. Yoder</u>, 406 U.S. 205 (1972).  In these cases, the Supreme Court had held that if the Government substantially burdened religious exercise, it was required to show that it had done so using the least restrictive means to achieve a compelling state interest.  <u>Gonzalez v. O Centro Espirita Beneficente Uniao Do Vegetal et al.</u>, 546 U.S. 418, 424 (2006).  <u>Smith</u> thus appeared to relieve the Government from having to show when it substantially burdened the exercise of religion that it had a compelling state interest in doing so, and had done so by the least restrictive means.

Congress responded to the decision in <u>Smith</u> by enacting the RFRA.  In the RFRA, Congress restored the compelling state interest and least restrictive means requirements as stated in <u>Sherbert</u> and <u>Yoder</u>.  <u>Id.</u>  Thus under the RFRA, the Government may "substantially burden a person's exercise of religion" only if the burden imposed "is in furtherance of a compelling government interest" and "is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-1(a)-(b).  The RFRA prohibits the Government from imposing a substantial burden on a person's religious practices "even if the burden results from a rule of general applicability."  § 2000bb-1(a).

20

*a.     Religious Exercise*

The RFRA defines religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  § 2000cc-5(7).  The plaintiff's claimed belief "must be sincere and the practice at issue must be of a religious nature."  Levitan v. Ashcroft, 281 F.3d 1313, 1320 (D.C. Cir. 2002). "Because the burdened practice need not be compelled by the adherent's religion to merit statutory protection, [the Court] focuses not on the centrality of the particular activity to the adherent's religion but rather on whether the sincere religious exercise is substantially burdened."  Kammerling v. Lapin, 553 F.3d 669, 678 (D.C. Cir. 2008).

The Government does not dispute that Plaintiffs' sincerely held religious beliefs prohibit them from providing, subsidizing or facilitating abortion-inducing drugs, artificial contraceptives, sterilization services, and counseling or education related to these categories of products or services.  See Smith, 494 U.S. at 877 (defining "exercise of religion" to include "not only belief and profession but the performance of (or abstention from) physical acts . . . ").

b.    *Substantial Burden*

i.  Standard

Under the RFRA, a substantial burden on religious exercise exists when the Government (1) prohibits a person from "participation in conduct motivated by a sincerely held religious belief," Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1138 (10th Cir. 2013) (quotation marks and citations omitted); (2) compels a person to perform acts that violate a sincerely held religious belief, Yoder, 406 U.S. at 218; or (3) places "substantial pressure" on a person to "modify his behavior and [] violate his [religious] beliefs," Thomas, 450 U.S. at 717-18.

Several Circuits have determined that the contraceptive mandate, as applied to for-profit corporations, violates the RFRA because the Government's requirement to provide and pay for preventive care places substantial pressure on the companies, and their owners, to modify their behavior and violate their sincerely held religious beliefs.  See Korte v. Sebelius, 735 F.3d 654, 683 (7th Cir. 2013) (striking down the contraceptive mandate as applied to for-profit corporations because the Government pressure on the companies to provide contraceptive coverage and comply with the mandate forced the companies to violate their religious beliefs or face "ruinous" fines); Gilardi v. United States Dep't of Health and Human Serv., 733 F.3d 1208, 1217 (D.C. Cir. 2013) (holding

that the Government compelled the owners of a for-profit corporation to affirm a

"repugnant belief" by requiring the owners to "meaningfully approve and endorse

the inclusion of contraceptive coverage in their company's employer provided

plans . . . "); Hobby Lobby, 723 F.3d at 1141 (holding that the Government placed

a substantial burden on the plaintiffs by presenting them with a Hobson's choice of

either compromising their religious beliefs to comply with the regulations or pay

onerous fines).

The Eleventh Circuit has not addressed the meaning of a "substantial

burden" in an RFRA case, but it has addressed the meaning of a "substantial

burden" under the Religious Land Use and Institutionalized Persons Act

("RLUIPA").  In Midrash Sephardi, Inc. v. Town of Surfside, the Eleventh Circuit

interpreted and applied the section of the RLUIPA that provides:

> No government shall impose or implement a land use
> regulation in a manner that imposes a substantial burden
> on the religious exercise of a person, including a
> religious assembly or institution, unless the government
> demonstrates that imposition of the burden on that
> person, assembly, or institution—
>
> > (A) is in furtherance of a compelling governmental
> > interest; and
> >
> > (B) is the least restrictive means of furthering that
> > compelling governmental interest.

366 F.3d 1214, 1227 (11th Cir. 2004); 42 U.S.C. § 2000cc(a)(1).[11]  The RLUIPA

provides the same analytical framework used to evaluate the permissibility of a

burden on First Amendment Free Exercise rights under the RFRA,[12] and Midrash

is instructive here.  The court in Midrash turned to the "Supreme Court's definition

of 'substantial burden' within its free exercise cases" because they were

"instructive in determining what Congress understood 'substantial burden' to mean

in RLUIPA."  Midrash, 366 F.3d at 1226.  Reviewing the Supreme Court cases

that have considered the "substantial burden" issue in Free Exercise cases, the

court in Midrash held that "the combined import of these articulations leads us to

the conclusion that a 'substantial burden' must place more than an inconvenience

on religious exercise; a 'substantial burden' is akin to significant pressure which

directly coerces the religious adherent to conform his or her behavior accordingly."

Id. at 1227.  Our Circuit has observed that the substantial burden standard under

the RLUIPA is "almost entirely" borrowed from the RFRA.  Knight v. Thompson,

---

[11] The RLUIPA also prohibits the government from substantially burdening an institutionalized person's religious exercise with a generally applicable and neutral law unless the Government shows that the burden on religious exercise is the least restrictive means of furthering a compelling interest.  42 U.S.C. § 2000cc-1(a).

[12] In 1994, the Supreme Court held that the RFRA was unconstitutional as applied to the several States and local governments.  City of Boerne v. Flores, 521 U.S. 507 (1994).  Congress responded by enacting the RLUIPA to restore some of RFRA's protections as applied to State and local governments.

723 F.3d 1275, 1282 (11th Cir. 2013).  "[W]hen the significance of a religious belief is not at issue, the same definition of 'substantial burden' applies under the Free Exercise Clause, RFRA and RLUIPA."  Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 813 (8th Cir. 2008); see also Hobby Lobby, 723 F.3d at 1138 n.13 ("Congress intended the substantial burden tests in RFRA and RLUIPA to be interpreted uniformly.") (citations omitted).

The Court concludes that the Eleventh Circuit's definition of a "substantial burden" in Midrash is the definition that other circuits have applied and it is the definition our circuit will apply in RFRA cases.  See Korte, 735 F.3d at 683; Gilardi 733 F.3d at 1217; Hobby Lobby, 723 F.3d at 1138.  The Plaintiffs thus must show that the requirement imposed on CENGI and Catholic Charities to prepare the certification in the form and manner specified by the Secretary and to then deliver it to Meritain Health is more than an inconvenience, and one which places substantial pressure on the Plaintiffs to modify their behavior and violate their religious beliefs.

Plaintiffs argue that a substantial burden exists whenever a person sincerely believes that the challenged regulations violate his religious beliefs and the Government imposes a substantial penalty for noncompliance.  This standard is not consistent with the substantial burden analysis set out in Midrash.  It also ignores

the Supreme Court's decision in <u>Thomas</u> in which the Court stated that a substantial burden exists when the Government "puts substantial pressure on an adherent to *modify his behavior* and to violate his beliefs."  450 U.S. at 717-18 (emphasis added).

Plaintiffs also rely on a sentence from <u>Hobby Lobby</u> in which the Tenth Circuit stated that "our only task is to determine whether the claimant's belief is sincere, and if so, whether the government has applied substantial pressure on the claimant to violate that belief."  723 F.3d at 1137.  The statement is taken out of context.  The statement was made to address the Government's argument that the RFRA does not protect a plaintiff when "government coercion somehow depends on the independent actions of third parties."  <u>Id.</u>  The Plaintiffs also ignore that the Tenth Circuit defined substantial burden as "'substantial pressure on an adherent . . . *to engage in conduct* contrary to a sincerely held religious belief.'"  <u>Id.</u> at 1138 (quoting <u>Abdulhaseeb v. Calbone</u>, 600 F.3d 1301, 1315 (10th Cir. 2010) (emphasis added)).  In <u>Hobby Lobby</u>, <u>Gilardi</u> and <u>Korte</u>, the courts were not focused on whether the for-profit corporations and their owners were forced to modify their behavior.  In those cases, the plaintiffs were compelled to provide and pay for contraceptive coverage, which is a self-evident modification of behavior that was not required to be addressed.  Here, the Plaintiffs are not required to directly

26

provide or pay for contraceptive coverage.

Defendants argue that this case is one where the requirement imposed on the Plaintiffs is the simple completion of the self-certification form that is no burden at all.  This contention is an overly simplistic, conclusory view of the case, and denies the nature of the requirement and the pressure imposed on those required to undertake self-certification.  In Kammerling, the D.C. Circuit interpreting the RFRA held that the burden imposed on a religious practice focuses on "whether the sincere religious belief is substantially burdened."  535 F.3d at 678.  What is required in the case here is a critical evaluation of whether the requirements of the accommodation impose a substantial burden on these Plaintiffs' religious exercise.  "[An] inconsequential or *de minimis* burden on religious practice does not rise to [the] level of a substantial burden, [and neither] does a burden on activity unimportant to the adherent's religious scheme."  Id.  The Government does not contend that there is no burden on the Plaintiffs' religious practices.  It argues instead that any burden imposed by the contraceptive mandate is not substantial, but *de minimis*.

The nature of burdens on the exercise of religious rights has from time to time been addressed in other courts.  For example, in Henderson v. Kennedy, the plaintiffs objected to regulations that prohibited them from selling t-shirts on the

27

National Mall.  253 F.3d 12, 13-14 (D.C. Cir. 2011).  In <u>Mahoney v. Doe</u>, the

plaintiffs challenged regulations that prohibited them from "chalking" the sidewalk

near the White House.  642 F.3d 1112, 1115 (D.C. Cir. 2011).  In both of these

cases, the D.C. Circuit found the burden on First Amendment rights not to be

substantial because the plaintiffs could sell or write what they wanted—they just

had to comply with restrictions against doing so in certain limited, defined

locations.  That is, in both <u>Henderson</u> and <u>Mahoney</u>, the D.C. Circuit found that the

regulations did not impose a substantial burden on the plaintiffs under the RFRA

because the restrictions "were one of a multitude of means" through which the

plaintiffs could exercise their religion and other alternatives were available, in fact

immediately, near the mall or the White House to the plaintiffs to sell or write what

they wanted.  <u>Henderson</u>, 253 F.3d at 17; <u>Mahoney</u>, 642 F.3d at 1121.  Similarly,

in <u>Smith v. Allen</u>, the Eleventh Circuit held that a prison facility's decision to limit

the plaintiff's religious practices to a secure location placed no more than an

"incidental burden" on his practice of Odinism because the plaintiff remained free

to practice his religion in a secure area.  502 F.3d 1255, 1279 (11th Cir. 2007)

<u>(overruled on other grounds by</u> <u>Sossamon v. Texas</u>, 131 S. Ct. 1651 (U.S. 2011)).

      An incidental burden or a mere inconvenience to a person's religious

exercise does not violate the RFRA.  <u>Id.</u>  The Court thus evaluates whether the

contraceptive mandate is merely an inconvenience or has only a *de minimis* impact on the Plaintiffs' religious exercise, or whether the burden is greater. The Government relies on "inconsequential" and "*de minimis*" burden cases to assert that all the Plaintiffs are required to do here is fill out a simple form stating their sincerely held religious beliefs so that their employees can, from other sources, be given the contraceptive products and services to which Plaintiffs object on religious grounds. The Plaintiffs allege that they are compelled to modify their behavior and engage in conduct that violates their sincerely, and historically, held religious beliefs. The question here is whether the regulations challenged in this case are a substantial burden or a mere *de minimis* imposition on Plaintiffs' religious beliefs. The Court evaluates, on the facts of this case, whether the regulations put "substantial pressure" on the Plaintiffs to modify their behavior and violate their sincerely held religious beliefs. <u>Thomas</u>, 450 U.S. at 717-18.

ii. <u>CENGI and Catholic Charities</u>[13]

The Government describes the self-certification requirement as a "purely administrative" act that does not compel CENGI and Catholic Charities to modify

---

[13] The Plaintiffs do not differentiate the claims of the Atlanta Archdiocese and the Savannah Diocese from the claims of CENGI and Catholic Charities. The Court, however, addresses them separately because the contraceptive mandate and the accommodation do not apply to the Diocesan Plaintiffs.

their behavior and thus imposes a *de minimis* burden on their religious exercise.  In the Government's view, the accommodation does not impose a substantial burden because CENGI and Catholic Charities remain free to refuse to provide contraceptive coverage, "voice their disapproval of contraceptive use, and [] encourage [their] employees to refrain from using contraceptive services."  Defs.' Mem. In Opp'n to Pls.' Mot. for Summ. J. at 5-6.

The Government also alleges that the true nature of Plaintiffs' religious objection is directed at third parties—mainly, the employees of CENGI and Catholic Charities who may receive contraceptive coverage from Meritain Health free of charge.  On this view of the burden, the Government argues that the requirement to self-certify and deliver the form to a TPA is a permissible burden that does not give rise to an RFRA violation.  The Government rejects that completion of the self-certification form compels the Plaintiffs to modify their own behavior and violate their sincerely held religious beliefs.  The Government thus claims that Plaintiffs' RFRA claim is indistinguishable from the plaintiffs' objection to the actions of third parties in <u>Bowen</u> and <u>Kammerling</u>.  The Court disagrees.

<u>Bowen v. Roy</u> involved an application for and receipt of benefits from the Aid to Families with Dependent Children program and the Food Stamps program.

476 U.S. 693 (1986).  The plaintiffs specifically objected to the Government's use of a social security number for their younger daughter, "Little Bird of the Snow," on the ground that the use of the number violated their religious beliefs.  Id. at 695. The plaintiffs asserted a religious belief that "control over one's life is essential to spiritual purity and 'indispensible to becoming a holy person.'"  Id. at 696.  The Supreme Court found that plaintiffs' religious beliefs were not violated by the Government's use of the social security number.  Id. at 712.  The Supreme Court noted that its cases "have long recognized a distinction between the freedom of individual belief, which is absolute, and the freedom of individual conduct, which is not absolute."  Id. at 699.  The Court observed that the plaintiffs' objection was to the government's use of the social security number because they claimed that the use "may harm [their] daughter's spirit."  Id.  The Court found that the requirement to provide a social security number was "wholly neutral," and specifically noted that:

> It does not intrude on the organization of a religious institution or school.  It may indeed confront some applicants for benefits with choices, but in no sense does it affirmatively compel appellees, by threat of sanctions, to refrain from religiously motivated conduct or to engage in conduct that they find objectionable for religious reasons.

Id.[14]

Bowen is a different case than the one before the Court.  Here, the Government acknowledges that the contraceptive mandate infringes on religious beliefs and has excluded churches and other faith based organizations from providing contraceptive coverage to their employees.  Recognizing that the requirement also impacts non-exempt faith based organizations whose services are offered as, adjacent to, or part of the operations of exempted organizations, the Government has used the non-exempt faith-based organizations as a means of requiring contraceptive coverage and, in doing so, has designed an allegedly *de minimis* burden that it claims does not substantially burden the non-exempt organizations' religious beliefs.  In doing so, the Government has ignored the Supreme Court's recognition in Bowen that the "freedom of individual religious belief is absolute," and at its core, the Government seeks to "affirmatively compel" the non-exempt Plaintiffs to engage in conduct that they find objectionable for religious reasons.  Id.  The Government argues that it can do so because the effort to engage in the objectionable conduct is slight, and because the burden is

---

[14] The Court generally noted that it was the plaintiffs who sought benefits from the Government and who asserted that, because of certain beliefs, they should be excused from complying with conditions that were binding on all other persons who similarly sought the same benefits from the Government.  Id. at 703.  That is not the case here.

permissible under the RFRA.[15]

Bowen, in fact, may support the Plaintiffs in this case.  The majority's holding in Bowen was limited to the dissemination of information already in the possession of the Government, which did not compel the plaintiffs to engage in any action or conduct.  The Supreme Court specifically held that the Government may use and disseminate information already in its possession even if the plaintiffs sincerely believed that the Government's use of the information was offensive to their sincerely held religious beliefs.  Id. at 699.  The plaintiffs also objected, however, to the *compulsion to provide* the social security number to the Government.  Five Justices strongly suggested that the compulsion to provide the social security number—as opposed to the objection to the number's use by someone else—violated the plaintiffs' First Amendment rights.  See id. at 732 (dissenting in part because "the Government failed to show that granting a religious exemption to those who legitimately object to providing a Social Security number will do any harm to its compelling interest in promoting welfare fraud." ) (O'Connor, J., Brennan, J., and Marshall, J., concurring in part and dissenting in

---

[15] The Court in Bowen also noted the distinction between governmental compulsion and conditions relating to governmental benefits.  Id. at 705.  Here, CENGI and Catholic Charities are compelled to participate in the process to provide contraceptive coverage through a third party or be penalized for not participating in the process.

part); Id. at 733 (dissenting from the Court's opinion and judgment with respect to both the objection to provide the social security number and the Government's independent use of the social security number) (White, J., dissenting); Id. at 714-716 (stating that the case should be remanded to determine whether the issue was moot, but agreeing that the Government "may not deny assistance to Little Bird of the Snow solely because her parents' religious convictions prevent them from supplying the Government with a social security number for their daughter.") (Blackmun, J., concurring in part).  Of course, the Court recognizes that the concurring and dissenting opinions cited above are not part of Bowen's holding.  That five Justices in Bowen were willing to find a constitutional violation when the plaintiff was compelled to provide a social security number not only shows that the Government's reliance on Bowen is misplaced, but it also discredits the Government's defense that the requirement to sign and deliver the self-certification form is *de minimis*.[16]

The Government's reliance on Kammerling is equally misplaced for the same reasons.  In Kammerling, the plaintiff claimed that the taking of DNA

---

[16] There is no objective difference between the requirement to provide a social security number in Bowen, and the requirement to execute the self-certification form in this case.  The requirement to provide a social security number can also be characterized as an "administrative act," but that does not mean it is shielded from an RFRA challenge.

samples from him "defile[d] God's temple" in violation of his Free Exercise rights. 553 F.3d at 677.  The D.C. Circuit considered whether the sampling requirement violated the RFRA by putting "substantial pressure on [Kammerling] to modify his behavior and violate his beliefs."  Id. at 678.  The D.C. Circuit held that Kammerling did not have any exercise of religion that he alleged was the subject of the burden.  Id. at 679.

In reaching this conclusion, the D.C. Circuit in Kammerling applied Bowen to conclude that the plaintiff's only objection was directed at the actions of a third party, but he had no objection, on religious grounds or otherwise, to any of his own acts being compelled by the Government.  Id. at 679-80.  The facts are different here.  In this case, CENGI and Catholic Charities are compelled by the Final Rules to provide a self-certification form to their TPA—an act that they, on their own, are required to perform independent of any third party's act.  The Final Rules require the Plaintiffs to state their objection to the services and products that the ACA mandates, and then require the Plaintiffs to take affirmative action that enables a third party to provide to the Plaintiffs' employees the very services to which Plaintiffs have a sincerely held religious objection.  The manner in which the self-certification form is designed forces the Plaintiffs to take action in direct contradiction to what they believe.  At its core, the self-certification form requires

CENGI and Catholic Charities to modify their behavior when the Final Rules compel them to sign and deliver a document that is designed by the Government to set in motion delivery of contraceptive products and services to which they so strenuously object.

The Final Rules "treat[]" the self-certification form as a "designation of the third party administrator [] as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA."  78 Fed. Reg. at 39,879.  The self-certification form provides notice to a TPA of its obligations under the Final Rules.  Id.  The TPA's duty to pay or arrange for contraceptive coverage is imposed upon receipt of the self-certification form from CENGI and Catholic Charities.  Id. at 39,879-80.  The Final Rules explicitly provide that the TPA's duty to provide contraceptive coverage arises only if the TPA enters into a contract with a self-insured plan and the TPA receives a self-certification form from eligible organizations such as CENGI and Catholic Charities.  Id.  The TPA's obligation to provide contraceptive coverage exists only "so long as" the employees of Catholic Charities and CENGI remain enrolled in the Atlanta Plan.  45 CFR § 147.131(c)(2)(i)(B).  In Reaching Souls v. Sebelius, the Government conceded that the form is the vehicle by which the TPA seeks reimbursement plus a 10% reward for providing contraceptive coverage.  The Government also

36

conceded that federal reimbursement is not available without the self-certification form.  Dec. 16, 2013 Hrn'g Tr. at 96:15-18, No. 5:13-cv-1092-D, 2013 WL 6804259.

After a self-certification form is provided to the TPA, the Final Rules impose a further unconstitutional content-based restriction on the speech of CENGI and Catholic Charities by forbidding those required to execute a self-certification form from seeking to influence their TPA's decision to provide contraceptive coverage.  See Section II (B)(4) of this Order.  This is an additional restriction on CENGI and Catholic Charities that compels them to modify their behavior and to violate their religious beliefs.

If Meritain Health refuses to provide contraceptive coverage, the plain terms of the Final Rules require CENGI and Catholic Charities to find a TPA that is willing to provide coverage for preventive care.  Roman Catholic Archbishop of Washington, 2013 WL 6729515, at *20 n.19 (noting that the Government's interpretation of the regulations would require an eligible organization "to shop around to find a new [TPA] that will assume responsibility for the coverage or proceed without a [TPA] and await instructions from the government on how it can

otherwise satisfy its obligations" if the prior TPA declines to provide contraceptive coverage).[17]

If CENGI and Catholic Charities refuse to self-certify, the Government places pressure on them to either provide contraceptive coverage on their own or face a fine of $100 per day for each affected beneficiary.  If CENGI and Catholic Charities cancel their health plans altogether to avoid the contraceptive mandate, they may be subject to an annual penalty of $2,000 per full-time employee.

The Court concludes that the plain terms of the Final Rules show that the purpose and effect of the self-certification form is to enable the provision of contraceptive coverage.  The self-certification form is an integral part of the Government's contraceptive coverage scheme.  It creates legal rights and responsibilities, and it is a Government imposed device that pressures the Plaintiffs into facilitating the contraceptive coverage to which they have sincerely held religious objections.  Without the self-certification form, a TPA is not authorized to provide coverage, and a TPA cannot seek federal reimbursement plus 10% for margin and overhead.  The record here persuasively establishes the legal and practical burden the accommodation and the certification requirement place on

---

[17] This is another burden imposed by the Final Rules on the non-exempt Plaintiffs to modify their behavior and to violate their religious beliefs.

CENGI and Catholic Charities.  The accommodation thus imposes substantial pressure on the Plaintiffs to modify their behavior and violate their religious beliefs, including by enabling and facilitating contraceptive coverage to which they have strong religious objections.

The Court also concludes that the accommodation places substantial pressure on Catholic Charities and CENGI to either compromise their religious beliefs or suffer the onerous economic consequence of adhering to what they believe.  See Korte, 735 F.3d at 682-83; Gilardi, 733 F.3d at 1218; Hobby Lobby, 723 F.3d at 1141.

The Court's conclusion does not change even if the Government had argued, as it did in other cases, that it has no ERISA authority to require a church plan to contract with a TPA to provide contraceptive coverage or compel a TPA to provide contraceptive coverage after the TPA agrees to enter into a contract with the Plaintiffs and receives the self-certification form.  It is the fact of the requirement that is important, not whether the Government will or will not choose to enforce it.

The regulatory requirements and incentives in place here support the very real possibility, if not probability, that a TPA will provide contraceptive coverage voluntarily.  If the TPA voluntarily complies with the contraceptive mandate, Plaintiffs' complicity in a scheme that results in the delivery of products and

services in violation of their sincerely held religious beliefs is undiminished.  If the TPA voluntarily complies with the contraceptive mandate, the legal rights and responsibilities created by the self-certification form that are discussed in this Order largely remain unchanged, including federal reimbursement for the TPA that is not available without the self-certification form.  If the TPA voluntarily complies with the contraceptive mandate, the Government imposes the additional burden to unconstitutionally prohibit the Plaintiffs from influencing the TPA to not provide coverage that they vehemently and sincerely oppose.

The Atlanta Archdiocese has expressed its intention to remove CENGI and Catholic Charities from the Atlanta Plan if they are required to self-certify and provide the certification form to Meritain Health.  Given that CENGI and Catholic Charities are not going to remain on the Atlanta Plan if required to comply with the contraceptive mandate, the burdens imposed on them by the Final Rules remain unchanged, including the additional obligation to find a TPA that provides contraceptive coverage once they are removed from the Atlanta Plan.  See 29 C.F.R. § 2590.715-2713A(b)(1)-(4).[18]

The Government finally argues that even if the regulations impose more than

_____

[18] The terms of the Final Rules, when read as a whole, require CENGI and Catholic Charities to find a TPA that will provide contraceptive coverage.  See 29 C.F.R. § 2590.715-2713A(b)(1)-(4).

a *de minimis* burden on Plaintiffs' religious exercise, the burden is indirect and too attenuated to be substantial under the RFRA.  To support this argument, the Government claims that the ultimate decision to use artificial contraceptives rests with the Plaintiffs' employees, and the Plaintiffs are "further insulated" by the fact that their TPA "will actually contract, arrange, pay and refer" for contraceptive coverage.  Defs.' Mem. In Opp'n to Pls.' Mot. for Prelim. Inj. at 22.  Plaintiffs' religious beliefs unequivocally forbid the facilitation of artificial contraceptives and sterilization procedures.  In United States v. Lee, the plaintiff objected to being compelled by the Government to pay into the Social Security system because the system allowed third parties to act inconsistently with his religious beliefs.  455 U.S. at 257 (1981).  The Government responded to the plaintiff's claims by arguing that the "payment of social security taxes will not threaten the integrity of the Amish religious belief or observance."  Id.  The Supreme Court rejected the Government's rationale because "it is not within the judicial function and judicial competence, however, to determine whether [the plaintiff] or the government has the proper interpretation of his Amish faith; [c]ourts are not arbiters of scriptural interpretation."  Id. (internal quotations marks omitted).

The Government's attenuation argument requires the Court to determine whether facilitating access to artificial contraceptives and sterilization procedures

violates the Plaintiffs' religious beliefs.  The Court, of course, is not authorized to decide if the Plaintiffs have correctly interpreted their faith.  To argue that it does misunderstands the role of the Court.  In <u>Lee</u>, the Supreme Court accepted the Amish carpenter's claim that payment of Social Security taxes substantially burdened his religious exercise because the system imposed obligations on him that allowed third parties to act inconsistently with his religious beliefs.  The plaintiff's religious objection in <u>Lee</u> is indistinguishable from the Plaintiffs' religious objection in this matter to the facilitation of artificial contraceptives that may ultimately be used by others.

The Court rejects the Government's argument that the burden on Plaintiffs' religious exercise is too indirect and attenuated to be substantial under the RFRA. <u>See</u> <u>also</u> <u>Korte</u>, 735 F.3d at 684 (holding that "no civil authority can decide" whether "any complicity problem is insignificant or nonexistent."); <u>Gilardi</u>, 733 F.3d at 1218 (rejecting the Government's argument that the contraceptive mandate only imposes an indirect burden on the owners of a profit corporation because "the burden on religious exercise does not occur at the point of contraceptive purchase; instead, it occurs when a company's owners fill the basket of goods and services that constitute a healthcare plan."); <u>Hobby Lobby</u>, 723 F.3d at 1141 (stating that "Hobby Lobby and Mardel have drawn a line at providing coverage for drugs or

devices they consider to induce abortions, and it is not for us to question whether the line is reasonable.").  CENGI and Catholic Charities have shown that the self-certification form imposes a substantial burden on their religious exercise under the RFRA.

### iii.   The Diocesan Plaintiffs

There is no dispute that the Atlanta Archdiocese and the Savannah Diocese are exempt from the contraceptive mandate as religious employers.  The Plaintiffs, however, raise two issues that arguably apply to whether the Diocesan Plaintiffs can state a cause of action under the RFRA.  First, the Plaintiffs allege that the Atlanta Plan and the Savannah Plan will "almost certainly be required . . . to subsidize the objectionable products and services" that are covered by the contraceptive mandate.  Second, the Plaintiffs allege that the Atlanta Plan and Savannah Plan will be forced to expel their non-exempt affiliates if the non-exempt affiliates are required to self-certify and deliver the certification form to their TPA.

The Plaintiffs speculate that the costs of coverage are bound to be passed back to the church plans.  They argue that the reductions in user fees offered to the TPA, or to the ultimate provider of coverage, for participating in the Federally-facilitated health exchange

> would be established through a highly regulated and
> bureaucratic process, and it appears *most unlikely* that the

> reduction in user fees will fully compensate the regulated
> entities for the costs and risks associated with providing
> or procuring the objectionable coverage for those
> religious organizations that qualify for the
> "accommodation" and with complying with the Final
> Rule's regulatory framework.  As a result, few if any
> [TPAs] are *likely* to participate in this regime, and those
> that do are *likely* to increase fees charged to self-insured
> organizations.

Pls.' Mot. for Prelim. Inj. at 25 (emphasis added).  This claim is speculative at best,

and appears to be derived from an identical claim regarding self-insured

organizations described in Professor Harrington's affidavit, attached as Exhibit A

to the Plaintiffs' Motion for Preliminary Injunction.  Professor Harrington's

affidavit is equally speculative because it does not offer any evidence to support

the allegation that the Plaintiffs will pay for or subsidize the costs of contraceptive

coverage.[19]  The Plaintiffs also ignore that the Final Rules require the TPA to

provide coverage for preventive services "without cost sharing, premium, fee, or

*other charge* to plan participants or beneficiaries, or to the eligible organization or

---

[19] Plaintiffs do not specify whether each non-exempt affiliate bears its own health
care costs.  The Court notes that if CENGI and Catholic Charities directly pay for
the health care costs of their own employees, the Diocesan Plaintiffs cannot claim
that they will be required to pay for or subsidize contraceptive coverage because
the Diocesan Plaintiffs are exempt from the ACA.  The Court also rejects the
Plaintiffs' claim that the Final Rules require CENGI and Catholic Charities to pay
for or subsidize contraceptive coverage for the same reasons identified in this
section of the Court's Order.

its plan."  78 Fed. Reg. at 39879-80 (emphasis added).  The Final Rules specifically prohibit the TPA from "imposing a premium, fee, or other charge, or any portion thereof, *directly or indirectly*, on the eligible organization."  29 C.F.R. § 2590.715-2713A(b)(2)(i)-(ii) (emphasis added).  To accept the Plaintiffs' economic theories, the Court would be required to assume that the TPA may choose to violate the law by indirectly imposing costs on the Plaintiffs for providing contraceptive coverage, and that the Government will not enforce the law to prevent the TPA from imposing such costs.  The Court declines to assume the facts required by these arguments.

The Diocesan Plaintiffs also claim that the Final Rules pressure them to "expel" their non-exempt affiliates from their health plans in violation of the RFRA.  The Diocesan Plaintiffs do not allege that their religious beliefs require all of their affiliates to be on a single health plan.  In the absence of a compelled act that violates a religious tenet, there is no substantial burden on an adherent's religious beliefs under the RFRA.  Kammerling, 553 F.3d at 679-80.  The Diocesan Plaintiffs have failed to show any burden on their religious exercise, and their Motion for Summary Judgment on the RFRA claim is required to be denied.

### c.    *Compelling Interest*

The RFRA requires the Government to show that "the compelling interest test is satisfied through the application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened."  O Centro, 546 U.S. at 430-31 (internal citations omitted).  A "broadly formulated interest[]" that justifies the "general applicability of [a] government mandate[]" is insufficient to show a compelling state interest under the RFRA.  Id. at 431.  The Government argues that its interest in promoting public health and providing women with equal access to health care are compelling.  The Court does not doubt that the Government's interests are important.  The Court, however, is required to strictly "scrutinize the asserted harm of granting specific exemptions to particular religious claimants."  Id.

The Government has not clearly explained how granting an exemption to CENGI and Catholic Charities from the contraceptive mandate would undermine its interests in promoting public health and providing women with equal access to health care.  The Government claims that exempting CENGI and Catholic Charities from the contraceptive mandate would hinder its ability to effectively and uniformly administer the requirements of the ACA.  That claim is discredited by the Government's advocacy in other church plan cases in which it has argued that

46

plaintiffs lack standing because self-certification will not necessarily result in the delivery of contraceptive products and services.  If the Government has conceded that it has no power, or interest, to ensure that the employees of CENGI and Catholic Charities are provided with contraceptive coverage, then it appears unnecessary to require CENGI and Catholic Charities to self-certify and deliver the certification form to their TPA.[20]

Given the Government's argument that the accommodation will not necessarily result in the delivery of contraceptive coverage, the Government has failed to explain why the non-exempt Plaintiffs are required to fill out the form.  In Little Sisters of the Poor, et al. v. Sebelius, the Solicitor General of the United States recently stated that the purpose of the self-certification form is to "provide for regularized, orderly means of permitting eligible individuals or entities to declare that they intend to take advantage of them.  That is what the self-certification under the regulations accomplishes . . . ."  No. 13A691, Mem. for

---

[20] Uniform application of a law can be a compelling interest if the Government shows that granting an exemption would seriously hinder its ability to administer a federal program.  Lee, 455 U.S. at 258.  Here, the Government cannot claim that its ability to administer the contraceptive mandate will be compromised if an exemption is extended to CENGI and Catholic Charities because the Government does not even expect the employees of CENGI and Catholic Charities to be provided with contraceptive coverage in the first place.  This belief doubtfully is realistic.

Resp't in Opp'n to Appl. for an Inj. Pending Appeal, 2014 WL 108374, at *33 (Jan. 3, 2014).  A regularized, orderly means of allowing CENGI and Catholic Charities to declare that they will not provide contraceptive coverage can be accomplished without embedding them in a regulatory framework that renders them morally complicit in a scheme to provide contraceptive coverage.  This purpose could be achieved by requiring the employees who request coverage to self-certify that their employer is a religious nonprofit that does not provide contraceptive coverage.  It could also be achieved by requiring CENGI and Catholic Charities to do no more than simply inform the Government that they are non-profit organizations with religious objections to providing contraceptive coverage without explicitly treating their objections as an authorization for a TPA to provide coverage and seek reimbursement from the Government or designating their written objection as an instrument that creates legal rights and responsibilities.[21]  See Little Sisters of the Poor, 2014 WL 272207, at *1 (Jan. 24, 2014) (remanding to the Tenth Circuit and enjoining the Defendants from enforcing the contraceptive mandate during the pendency of the appeal, so long as plaintiffs submit written objections to providing contraceptive coverage based on

---

[21] For these reasons, the Government also cannot meet its burden to show that the accommodation is the least restrictive means of achieving its goals.

religious beliefs directly to Defendant Sebelius).

The Government's interests in promoting public health and providing women with equal access to health care also cannot be compelling because the contraceptive mandate does not apply to the insurance plans of millions of women in this country.  "A law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." O Centro, 546 U.S. at 547 (internal citations and quotation marks omitted).  Grandfathered health plans, small businesses and religious employers are all exempt from the contraceptive mandate.  The Government's claim that it has a compelling interest in enforcing the accommodation against CENGI and Catholic Charities because it seeks to promote the uniform availability of contraceptive products and services is severely undermined by the exemptions to the contraceptive mandate that leave millions of women without coverage for contraceptive care.  See Korte, 735 F.3d at 686-87; Gilardi, 733 F.3d at 1222-23; Hobby Lobby, 723 F.3d at 1144.

### d. *Least Restrictive Means*

Even if the Court assumed that the Government's stated interests in enforcing the accommodation against CENGI and Catholic Charities are compelling, the Government has not demonstrated that the contraceptive mandate

is the "least restrictive means of furthering . . . [those] interests."  <u>See</u> 42 U.S.C.

§ 2000bb-1.  "A statute or regulation is the least restrictive means if 'no alternative

forms of regulation would [accomplish the compelling interest] without infringing

[religious exercise] rights.'"  <u>Kammerling</u>, 553 F.3d at 684 (quoting <u>Sherbert</u>, 374

U.S. at 407).  The Plaintiffs suggest that the Government could achieve its goals

without infringing their religious exercise by (1) directly providing contraceptive

coverage to the non-exempt Plaintiffs' employees, (2) offering grants to providers

of contraceptive services to incentivize free coverage, or (3) giving tax incentives

to women who purchase contraceptive services.  Pls.' Mot. for Prelim. Inj. at 30.

The Seventh Circuit recognized as workable alternatives the options stated in (1)

and (2) above.  <u>Korte</u>, 735 F.3d at 686.  The Government argues that Plaintiffs'

proposed alternatives are not viable because HHS lacks the statutory authority to

implement them, and because the proposed alternatives are infeasible and

ineffective.  HHS can request Congress to provide the requisite authority needed to

implement less restrictive means towards achieving the Government's goals.

<u>Roman Archdiocese of New York</u>, 2013 WL 6579764, at *18.  The Court also

finds that the Government has not offered any evidence to support its assertion that

the Plaintiffs' proposed alternatives would be ineffective or infeasible.  <u>See</u> <u>also</u> <u>id.</u>

at *18-19.

The Court concludes that there is no genuine issue of material fact regarding whether the contraceptive mandate and its accompanying requirements in the Final Rules impose a substantial burden on the non-exempt Plaintiffs' religious exercise. The Government also has failed to show that the contraceptive mandate is the least restrictive means towards achieving a compelling state interest.  CENGI's and Catholic Charities' Motion for Summary Judgment is granted on their RFRA claim, and the Government is permanently enjoined from enforcing the Final Rules against them.

ii.   <u>Standing</u>

The Court now addresses the Government's arguments regarding the Plaintiffs' standing to assert an RFRA claim that were raised earlier in this matter, and the Government's arguments that were raised in other church plan cases.

On January 1, 2013, the Government moved to dismiss the Plaintiffs' Complaint on the grounds that the Plaintiffs lacked Article III standing.  The Government argued that the Atlanta Plaintiffs could not demonstrate an injury-in-fact because the health plans were grandfathered and thus exempt from the requirements of the contraceptive mandate.  The Government also argued that the Plaintiffs could not show an injury-in-fact because the temporary enforcement safe harbor protected the Plaintiffs until August 1, 2013, and the Government's Final

51

Rules were subject to revision during that time.[22]  The Government withdrew its Motion to Dismiss for Lack of Jurisdiction and no longer contends that the Plaintiffs lack standing to bring their RFRA claim.  The Court, however, will address whether the Plaintiffs have adequately alleged an injury-in-fact because the Atlanta Plan remains grandfathered and thus exempt from the ACA.[23]

The Government also has sought to sidestep certain important issues on jurisdictional grounds in other church plan cases.  There are, to date, at least, 20 cases around the country in which federal courts have addressed whether the requirement imposed on non-profit eligible organizations to execute a self-certification form pursuant to the contraceptive mandate violates the RFRA.  Eight of these cases, including this one, involve church plan plaintiffs where the employees of non-exempt eligible organizations that qualify for the accommodation receive health insurance through the church's self-insured health care plan.

---

[22] The 2013 Final Rules are in place, and there is no further revision contemplated.

[23] "A federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises."  Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1328 n.4 (11th Cir. 1999).  The Court has an independent duty to examine its own jurisdiction, and "standing is perhaps the most important of [the jurisdictional] doctrines." Walden v. Centers for Disease Control & Prevention, 669 F.3d 1277, 1283 (11th Cir. 2012) (quoting FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 230–31 (1990)).

In a twist to the sequence of events that have unfolded in some of the other church plan cases, the Government has belatedly argued that church plan plaintiffs do not have standing to assert an RFRA claim.  The Government's belated challenge to the plaintiffs' standing to raise an RFRA claim was based on its discovery, apparently after a careful reading of what is in the law, that it does not have statutory authority to enforce a TPA's obligation to provide coverage for preventive care.  The crux of the Government's claim in these other cases is that church plan plaintiffs have suffered no injury-in-fact for purposes of Article III standing because the TPA of a church plan will not provide contraceptive coverage, and if the Government has no power to compel the TPA of a church plan to provide contraceptive coverage, no contraceptive coverage will be provided to the beneficiaries of a church sponsored health care plan.  The Government thus reasons that Plaintiffs cannot assert an injury-in-fact for purposes of Article III standing because the act of self-certification does not, in fact, result in the facilitation of contraceptive products and services.

Article III of the United States Constitution provides that the judicial power of the federal courts extends only to "cases" and "controversies."  U.S. Const. art. III, § 2, cl. 1.  It is well-settled that this limited extension of power imposes substantive constitutional constraints on the power of federal courts to resolve legal

disputes.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  The

doctrine of standing is a fundamental boundary of the judicial power to decide

cases and controversies.  Id.  "[T]he question of standing is whether the litigant is

entitled to have the court decide the merits of the dispute or of particular issues."

Warth v. Seldin, 422 U.S. 490, 498 (1975).  This is a threshold issue in every

federal case.  Id.  "[A] plaintiff who invokes the jurisdiction of a federal court

bears the burden to show (1) an injury-in-fact, meaning an injury that is concrete

and particularized, and actual or imminent, (2) a causal connection between the

injury and the [challenged] conduct, and (3) a likelihood that the injury will be

redressed by a favorable decision."  CAMP Legal Defense Fund, Inc. v. City of

Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006) (internal quotation marks omitted).

Standing "must be supported in the same way as any other matter on which the

plaintiff bears the burden proof," that is, "with the manner and degree of evidence

required at the successive stages of the litigation."  Id.

The Plaintiffs allege that they cannot continue their grandfathered status

under the ACA because the Atlanta Plan's coverage costs have increased by over

14% each year since March 23, 2010.  This increase in coverage costs is alleged to

have required the Atlanta Archdiocese to incur millions of dollars in losses to

maintain its grandfathered status to avoid the requirements of the ACA.  Under the

regulations, grandfathered status is lost if an insurance plan's employer contributions decrease by more than 5% of the cost of coverage in comparison to the employer contributions made as of March, 2010.  26 C.F.R. § 54.9815-1251T(g)(1)(v).  The Atlanta Plan's coverage costs have increased by over 14% per year since March 2010.  The Plaintiffs assert that these increased costs will require their employer contributions to decrease by more than 5% of the cost of coverage in comparison to their contributions made in March, 2010.  When these additional costs for coverage cause the employer contributions to decrease, the Atlanta Plan will lose its grandfathered status.  When the Atlanta Plan is no longer grandfathered, the Final Rules will require CENGI and Catholic Charities to comply with the contraceptive mandate.

The Atlanta Archdiocese has maintained its grandfathered status to avoid CENGI and Catholic Charities from having to comply with the accommodation. When this grandfathered status is lost, as the Atlanta Plaintiffs advise the Court that it will in 2014, CENGI and Catholic Charities will be required to comply with the accommodation.  It is well-established that economic losses caused by regulations constitute an injury-in-fact for purposes of standing.  See Planned Parenthood Ass'n of Atlanta Area, Inc. v. Miller, 934 F.2d 1462, 1465 (11th Cir. 1991); Chiles v. Thornburgh, 865 F.2d 1197, 1209-10 (11th Cir. 1989) (finding

that the "economic detriment suffered by Dade County as a result of the Krome riots and escapes is the epitome of an injury in fact."). The Court finds that the economic losses sustained by the Atlanta Archdiocese to protect the Atlanta Plan's grandfathered status to allow CENGI and Catholic Charities to avoid having to comply with the contraceptive mandate are sufficient to show an injury-in-fact. This economic loss—the incurred cost increases to protect the Atlanta Plan's grandfathered status—results solely from the Atlanta Archdiocese's resolve to protect CENGI and Catholic Charities from being subject to the accommodation, including the requirement to provide a self-certification form that results in the provision of contraceptive coverage to their employees.

That the Atlanta Plaintiffs assert the inevitable loss of their grandfathered status because they cannot continue to incur coverage cost increases also supports that there is an imminent, injury-in-fact for purposes of standing. CAMP, 451 F.3d at 1269. A plaintiff has standing to bring a claim when the injury is "'imminent— not abstract, hypothetical, or conjectural,' or when application of the challenged statute is likely, or there is a credible threat of application." America's Health Ins. Plans v. Hudgens, No. 13-10349, 2014 WL 563604, at *4 (11th Cir. Feb. 14, 2014) (internal citations and quotation marks omitted). The Atlanta Plaintiffs assert that sometime in 2014, the Atlanta Archdiocese will be unable to absorb the cost

increases of the Atlanta Plan and when it does it will have to adjust the amount of its employer contributions.  When these adjustments are made, CENGI and Catholic Charities will be required to comply with the contraceptive mandate. Even if the Atlanta Plaintiffs were not suffering an economic injury-in-fact, an injury-in-fact is imminent.  Id.

The Court finds that there is a sufficient nexus between the claimed, or imminent, injury-in-fact, and the requirement to provide a certification form to confer standing on the Atlanta Plaintiffs.  Put another way, the economic losses here constitute an actual or imminent injury-in-fact, causally connected to the conduct Plaintiffs challenge in this action and the injury alleged is likely to be redressed by a favorable outcome in this action.  CAMP, 451 F.3d at 1269.

The Atlanta Archdiocese also provides insurance for the employees of CENGI and Catholic Charities through the Atlanta Plan.  The Plaintiffs allege that the Atlanta Archdiocese must either sponsor a health care plan that provides contraceptive coverage or expel its non-exempt affiliates from the Atlanta Plan. The Court finds that these allegations are also sufficient to confer standing in this action.  See Roman Catholic Archdiocese of New York v. Sebelius, No. 12 Civ 2542(BMC), 2013 WL 6579764, at *7 (E.D.N.Y. Dec. 16, 2013).

In other church plan cases, the Government has argued that its authority to penalize a TPA that refuses to provide coverage for preventive services derives from ERISA.  Self-insured health care plans such as the Atlanta Plan and the Savannah Plan, however, are exempt from the requirements of ERISA because they are "church plans."  29 U.S.C. § 1003(b)(2).  The Government has thus claimed in these other church plan cases that it does not have authority to force a TPA to provide contraceptive services if the TPA refuses to do so.  This is so, the Government has asserted, even though the Final Rules by their terms apply equally to all TPAs, and irrespective of whether they are "church plans."  In these other cases, and in this one, the Government does not assert that it will not enforce the requirement imposed on a non-exempt entity to self-certify and provide the certification form to the TPA.

The upshot of the Government's argument in these other church plan cases essentially is that it "can neither require the [TPA] of a church plan to end its contractual relationship for failing to assume responsibility for contraceptive services coverage nor penalize the [TPA] that assumes the responsibility if it fails to actually provide that coverage."  Roman Catholic Archbishop of Washington v. Sebelius, 2013 WL 6729515, at *25-26.  The Final Rules, however, by their terms state that if the TPA agrees to enter into a contractual relationship with a

self-insured plan after an eligible organization provides the TPA with a self-certification form, the TPA must provide or arrange for separate payments for preventive services.  29 C.F.R. § 2590.715-2713(A)(b)(1) (emphasis added).  If the TPA declines to provide the required coverage, the regulations require a self-insured plan to find a TPA that is able and willing to provide the mandated preventive services.  In <u>Roman Catholic Archbishop of Washington</u>, the Government admitted that the regulations impose an additional burden on a self-insured plan to find a TPA that provides coverage for preventive care if its current TPA refuses to do so.  2013 WL 6729515, at *21 n.19.[24]  The Government now claims that self-insured church plans cannot be compelled to find another TPA if their current TPA refuses to provide contraceptive coverage even though the written regulations apply equally to *all* self-insured plans regardless of whether the plans are sponsored by a church.  <u>See</u> 29 C.F.R. § 2590.715-2713(A)(b).[25]

---

[24] The district court observed that "the regulations do not spell this out explicitly, but both parties agree that this is what they will entail."  <u>Roman Catholic Archbishop of Washington</u>, 2013 WL 6729515, at *21 n.19.

[25] The Government's argument appears to be that a government imposed obligation may be ignored by a citizen if there is no mechanism for the government to enforce compliance with the written regulations.  The Government also appears to claim that a legal obligation is a not real one if it cannot be enforced.  The Court rejects both of these suggestions.

The Government managed to persuade one district court that execution of the self-certification form is inconsequential and does not result in an injury-in-fact for the purposes of Article III standing because a church plan's TPA will not provide contraceptive coverage, or can ignore without consequence, the requirement to provide contraceptive coverage.  Roman Catholic Archbishop of Washington, 2013 WL 6729515, at *26-27.  The Government's argument rests on the following flawed premises: (1) that the combined effect of all the regulations that require CENGI and Catholic Charities to execute a self-certification form cannot be interpreted as rendering the Plaintiffs complicit in a scheme to provide products and services that they deem offensive to their religious beliefs; and (2) that the TPA of a church plan will not provide coverage for artificial contraceptives or sterilization under any circumstances or will not be subject to any enforcement risk for not doing so.

The first prong of this premise ignores that CENGI and Catholic Charities are required to execute, and deliver to a TPA, a self-certification form that they believe violates their sincerely held religious beliefs, and if they do not provide the certification form to their TPA, oppressive penalties will be imposed on them by the Government.  These undisputed facts alone are sufficient to confer standing under federal law.  Georgia Latino Alliance for Human Rights v. Governor of

Georgia, 691 F.3d 1250, 1257–58 (11th Cir. 2012) (noting that in "a preenforcement, constitutional challenge to a state statute, the injury requirement may be satisfied by establishing 'a realistic danger of sustaining direct injury as a result of the statute's operation or enforcement.'") (citations omitted); see also Roman Catholic Archdiocese of New York, 2013 WL 6579764, at *7 (finding that the church plan plaintiffs had Article III standing because there was no dispute that the non-exempt plaintiffs were required to "either comply with the Mandate and provide the objectionable coverage or self-certify that they qualify for the accommodation."); accord Michigan Catholic Conference v. Sebelius, No. 1:13-CV-1247, 2013 WL 6838707, at *4 (W.D. Mich. Dec. 27, 2013) (ruling that the Government's argument regarding the injury-in-fact requirement for standing is flawed because the Government ignores plaintiffs' religious objection to self-certify and deliver the form to their TPA).

The second prong of the Government's argument is based on the assumption that a church plan's TPA will not provide coverage for contraceptive services.[26]  While wishing does not always make it so, the Government here has not taken a position on whether Meritain Health, the TPA of the Atlanta Plan and

---

[26] In Roman Catholic Archbishop of Washington, the district court credited the Government's assumption and "inferred" that a church plan's TPA would decline to provide coverage.  2013 WL 6729515, at *25-26 n.22.

the Savannah Plan, would provide coverage for artificial contraceptives upon

receiving a self-certification form from CENGI and Catholic Charities. The

Government's argument addressed in other church plan cases does not apply here.

On the record in this matter, there is no basis to accept the Government's

assumption that a church plan TPA will not provide coverage for artificial

contraceptive coverage and here the Government has not, to this point, suggested

that Meritain Health will decline to provide coverage for products and services that

are offensive to Plaintiffs' religious beliefs. Interestingly, and maybe the reason

the Government has abandoned its argument that "no church plan TPA will

provide contraceptive coverage" is the opinion in <u>Reaching Souls Int'l, Inc. v.</u>

<u>Sebelius</u>. In <u>Reaching Souls</u>, the court noted that Highmark—the TPA for the

largest church plan in the country—adopted a plan to carry out the accommodation

and provide contraceptive coverage. No. 5:13-cv-1092-D, 2013 WL 6804259, at

*7 (W.D. Okla. Dec. 20, 2013). It is, at the core, irrelevant whether the

Government has the authority to enforce the contraceptive mandate against a TPA

which undertakes to provide coverage for preventive care, and there is no

legitimate basis to speculate that the TPA will not provide coverage offensive to

the Plaintiffs here. That a TPA of a church plan may voluntarily comply with the

contraceptive mandate and ultimately provide contraceptive services underscores

the legitimacy and reality of Plaintiffs' concern that the self-certification form causes them to be complicit in a scheme to provide contraceptive services, devices and products that violate their longstanding and deeply-held religious beliefs.[27]

The Plaintiffs have sufficiently alleged a judicially cognizable injury, which is causally related to the burdens imposed by the Government's Final Rules, and an injunction issued by the Court that bars the Government from enforcing the contraceptive mandate would redress the Plaintiffs' alleged injury. CAMP, 451 F.3d at 1269. The Court concludes that Plaintiffs have standing to bring their RFRA claim in this action.

---

[27] In Reaching Souls, the Government conceded that the regulations reward TPAs that agree to provide contraceptive services by offering full reimbursement plus 10%, but only if the TPA receives the self-certification form. Dec. 16, 2013 Hrn'g Tr. at 96:15-18, No. 5:13-cv-1092-D, 2013 WL 6804259. Considering Highmark's decision to provide coverage, it is inconsistent with logic and common sense to assume that Meritain Health, a commercial subsidiary of one of the largest insurance companies in the United States, will refuse to provide contraceptive coverage under all circumstances and decline the 10% premium paid by the Government. Logic and common sense support that the Government's promise to pay a 10% premium on top of the TPA's coverage costs provides a strong and perhaps irresistible commercial incentive for the TPA to voluntarily enact plans to carry out the accommodation and provide contraceptive coverage that is required to benefit from the 10% premium award. Highmark's decision also discredits the inference that the district court adopted in Roman Catholic Archbishop of Washington.

2.    *Free Exercise Clause*

The Free Exercise Clause of the federal constitution "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." Smith, 494 U.S. at 879 (internal citations and quotation marks omitted). Generally applicable and neutral laws that incidentally burden religious exercise are not subject to strict scrutiny under the Free Exercise Clause. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993). A neutral and generally applicable law needs to be justified only by a rational basis, under which it is presumed constitutional, and the plaintiff bears the burden to show that the law is not rationally related to a legitimate government interest. Keeton v. Anderson-Wiley, 664 F.3d 865, 879-80 (11th Cir. 2011).

A law is not neutral if "the object of [the] law is to infringe upon or restrict practices because of their religious motivation." Id. (quoting Church of the Lukumi Babalu Aye, Inc., 508 U.S. at 520). A facially neutral law constitutes a religious "gerrymander" if religious practice is singled out for discriminatory treatment, and the object of the law is "the suppression of religion." Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty., 450 F.3d 1295, 1309 (11th Cir. 2006).

A law is not generally applicable if the government selectively imposes burdens "'*only* on conduct motivated by religious belief.'"  Id. (quoting Church of the Lukumi Babalu Aye, Inc., 508 U.S. at 544-45) (emphasis added).  General applicability does not require regulations to be universally applicable.  See Gillette v. United States, 401 U.S. 437 (1971); see also Church of the Lukumi Babalu Aye, Inc., 508 U.S. at 542-43 (observing that "all laws are selective to some extent . . . [but] inequality results when a legislature decides that the government interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation.").  Specific exemptions to a law that are equally available to the adherents of a religious belief do not affect the law's general applicability.  Ungar v. New York City Hous. Autho., 363 F. App'x 53, 56 (2d Cir. 2010).

It is not disputed that the contraceptive mandate is neutral on its face.  Plaintiffs allege that the Government enacted the regulations as "part of a conscious political strategy to marginalize Plaintiffs' religious views on contraception by holding them up for ridicule on the national stage."  Pls.' Mot. for Prelim. Inj. at 33.  To support this allegation, Plaintiffs refer to cherry-picked statements made by Defendant Sebelius and the chief sponsor of a California contraception statute.  Plaintiffs also charge the IOM committee that drafted the accommodation with unsupported allegations of invidious discrimination and anti-

Catholic bias because the committee heard from "pro-choice" groups "without inviting any input from groups that oppose government-mandated coverage for abortion, contraception, and sterilization."  PRDSMF at 4-5.  The Plaintiffs argue that 85% of employer health plans already provide contraceptive coverage, and contraceptive coverage for the remaining 15% is cost-neutral, so the remaining "'gap'" must be "due largely to employers motivated by moral and religious concerns."  Pls. Mot. Summ. J. at 42.  The Plaintiffs thus infer that the Government's sole purpose in enacting the contraceptive mandate was "to squelch the small number of religious holdouts."  Id.

Plaintiffs, however, do not offer any evidence to show that the Final Rules were directly modeled on the California contraception law.  The Final Rules were "informed by the existing practices of some issuers and religious organizations in the 28 States where the contraception coverage requirements already exist, including Hawaii."  77 Fed. Reg. at 8,728.  That the Government examined the practices of religious organizations in 28 states across the country during the rulemaking process also shows that the Government considered the views of those opposed to the contraceptive mandate.  The Plaintiffs' allegations of bias and prejudice against the IOM committee are also insufficient to demonstrate hostility towards Catholicism.  The IOM committee's hearings were open to the public and

all individuals and organizations were free to submit written comments as they usually are whenever the Government drafts regulations that enact a complex statutory scheme.  DRPSMF at 5-6.  The fact that the IOM committee heard from "pro-choice" groups does not necessarily bear, in whole or in part, on the committee members' personal beliefs.

Plaintiffs' argument that the Government's sole purpose in enacting the contraceptive mandate was "to squelch the small number of religious holdouts," which is based on the fact that 85% of employer plans already provide contraception, and contraceptive coverage for the remaining 15% is cost-neutral, misses the point.  The Plaintiffs' argument requires the Court to juxtapose inference upon inference, and it is based on a misunderstanding of how the contraceptive mandate works.  Employers who already provide contraceptive coverage are now *required* to provide such coverage *without* cost-sharing, whereas they were *not* required to provide any coverage at all in the past, and there were no controls on cost-sharing.  The contraceptive mandate imposes new obligations on employers that provided contraceptive coverage in the past as well.

Plaintiffs' reference to cost-neutrality also does not make sense.  The Government's cost-neutrality argument supposes that the cost of providing contraceptive coverage would be offset by the costs from "improvements in

women's health, healthier timing and spacing of pregnancies, and fewer unplanned

pregnancies."  78 Fed. Reg. at 39, 877.  Whether the Government's cost-neutrality

hypothesis is credible, and whether issuers required to provide contraceptive

coverage who did not provide it in the past agree with the Government's

hypothesis, currently is unknown.  Plaintiffs assume, without the support of any

evidence, that (1) 15% of all employer health plans, with the exception of

"religious holdouts," did not provide contraceptive coverage in the past only due to

economic reasons, (2) every employer who falls in the remaining 15% of all

employer health plans will now not have qualms with providing contraceptive

coverage because of cost-neutrality, and (3) the remaining "'gap'" may be "due

largely to employers motivated by moral and religious concerns."  The Plaintiffs

do not present any evidence to support these assumptions or the syllogistic

reasoning that purports to support them.

Plaintiffs next point to Defendant Sebelius's statement that "we are in a war"

without explaining the context in which the statement was made.  Even when read

in context, the speech from which the statement is taken is, at most, a partisan

attack on her political opponents in Congress.  Defendant Sebelius's statement that

"forty percent of unplanned pregnancies end in those women seeking abortions,"

and the rhetorical question she posed "wouldn't you think that people who want to

reduce the number of abortions would champion the cause of widely available, widely affordable contraceptive services?" may nor may not be "insensitive" depending on one's perspective and political disposition.  See Roman Catholic Archbishop of Washington, 2013 WL 6729515, at *29 n.30.  The statements, as a whole, do not evidence an overt discriminatory intent or open display of prejudice.  See Church of the Lukumi Babalu Aye, Inc., 508 U.S. at 540-42.  They appear to be what we often see today – political hyperbole, which is not germane to the legal analysis required here.

The anecdotal evidence presented by the Plaintiffs lacks legal force and it is based, at most, on Plaintiffs' claims of the subjective intent of the drafters of the Final Rules, and does not evidence the practical effects of the challenged regulations.  In Midrash, the Eleventh Circuit explained that Lukumi's inquiry into a law's neutrality does not turn on whether the drafters exhibited an "invidious intent in enacting the law."  366 F.3d at 1234 n.16; see also Church of the Lukumi Babalu Aye, Inc., 508 U.S. at 558 (observing that the "the First Amendment does not refer to the purposes for which legislators enact laws, but to the effects of the laws enacted . . . ") (Scalia, J., concurring in part and concurring in the judgment); City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47 (1986); United States v. O'Brien, 391 U.S. 367, 383 (1968) (refusing to consider the motives of lawmakers

because "it is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive.").[28]

There is no evidence that the contraceptive mandate constitutes a religious "gerrymander."  This is especially true considering that the only permanent exemption to the requirement to provide, pay, arrange or refer for contraception coverage rests with religious institutions like the Atlanta Archdiocese and the Savannah Diocese.  The Government argues that it designed the accommodation to minimize the burdens placed on the non-exempt Plaintiffs' religious exercise even though the Government failed to meet RFRA's heavier burden to justify the regulations based on a compelling state interest.

This is not a case where the "pattern of exemptions [is carefully designed] to parallel the pattern of narrow prohibitions" targeted at Plaintiffs' religious beliefs.  Church of the Lukumi Babalu Aye, Inc., 508 U.S. at 537.  The exemption for grandfathered plans has a limited duration and it applies equally to religious

---

[28] Plaintiffs rely on United States v. O'Brien to point out that Defendants' "self-serving selection" of statements made by the sponsor of the Weldon Amendment does not "provide evidentiary support for the underlying factual statement."  PRDSMF at 46.  Yet, Plaintiffs evade the principle of constitutional law established in O'Brien with respect to their own "self-serving selection" of statements made by Defendant Sebelius and the chief sponsor of a California contraception statute.

employers and non-religious employers.  The exemption for small businesses applies to religious and non-religious employers alike, and small employers that offer health care coverage are required to provide contraceptive coverage. Plaintiffs have failed to show that the contraceptive mandate is not neutral.

Plaintiffs argue that the contraceptive mandate is not generally applicable because it grants exemptions.  Exemptions, even if there are many, do not affect the contraceptive mandate's general applicability.  The Plaintiffs have failed to show that the burdens of the contraceptive mandate are imposed only on them, and the categorized exemptions to the contraceptive mandate are equally available to the Plaintiffs on the same terms.  See Primera, 450 F.3d at 1295; Ungar, 363 F. App'x at 56.

The Court concludes that Plaintiffs have failed to show that the contraceptive mandate is not rationally related to the Government's claimed legitimate interest in increasing women's access to what the Government characterizes as preventive care.  Plaintiffs' Motion for Summary Judgment on their Free Exercise Clause claim is required to be denied.

### 3.    Compelled Speech

Plaintiffs allege that the contraceptive mandate violates their free speech rights because it compels them to facilitate counseling related to abortion-inducing

products, contraception and sterilization procedures.

The First Amendment prohibits the Government from "telling people what they must say." Rumsfeld v. Forum for Academic and Inst. Rights, Inc. (FAIR), 547 U.S. 47, 61 (2006). The First Amendment does not allow the Government to "force one speaker to host or accommodate another speaker's message." Id. at 63 (internal citations omitted). The Supreme Court, however, has found compelled-speech violations only when "the complaining speaker's own message [is] affected by the speech it was forced to accommodate." Id.; see also Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U.S. 557 (1995) (holding that the State violated the parade organizers' free speech rights by compelling them to "include among the marchers a group imparting a message the organizers do not wish to convey."); Pacific Gas and Elec. Co. v. Pub. Util. Comm'n of California, 475 U.S. 1, 20-21 (1986) (holding that the forced inclusion of a third party's newsletter in a utility company's billing envelope violated the First Amendment because the newsletter interfered with the utility's own message). The complaining speaker's message is affected by hosting a third party's speech when there is a risk that the third party's objectionable message may be imputed to the complaining speaker. FAIR, 547 U.S. at 63; Hurley, 515 U.S. at 575.

The First Amendment protects inherently expressive conduct.  <u>Texas v.</u> <u>Johnson</u>, 491 U.S. 397, 406 (1989).  In the absence of inherent expressiveness, compelled speech that is incidental to the regulation of conduct does not infringe the First Amendment.  <u>FAIR</u>, 547 U.S. at 62.

The contraceptive mandate requires a health plan to provide patient education and counseling for all women with reproductive capacity.  Even if the Court assumes that education and counseling are intended to encourage the use of contraceptive services, the mere act of authorizing a TPA to provide coverage for counseling related to contraception does not require the Plaintiffs to say anything.[29] Plaintiffs also do not, and cannot, claim that providing health insurance or contraceptive coverage is inherently expressive.  <u>See</u> <u>id.</u> at 64 (rejecting association of law schools' argument that allowing military recruiters on campus is inherently expressive because recruiting "lacks the expressive quality of a parade, a newsletter, or the editorial page of a newspaper . . . ").

To the extent that the requirement to provide or facilitate education and counseling compels any speech, the speech is incidental to the regulation of

---

[29] The Final Rules do not regulate the content of a patient's communications with her physician.  The plain terms of the Final Rules are viewpoint neutral, but the Plaintiffs insist that the counseling is intended to encourage the use of artificial contraceptives.

conduct, which does not infringe the Free Speech Clause.  The Court also finds that there is no credible basis to say that a doctor's message regarding whether to use artificial contraceptives may be imputed to the Plaintiffs given their steadfast and longstanding opposition to contraception.  Plaintiffs remain free to voice their opposition to the use of contraceptive services as they see fit.  See id. at 65 (holding that "nothing about recruiting suggests that law schools agree with any speech by recruiters and nothing in the Solomon Amendment restricts what the law schools may say about the military's policies.").[30]

Plaintiffs contend that the certification form compels them to engage in speech that "triggers provision of the objectionable products and services, and deprives them of the freedom to speak on the issue of abortion and contraception on their own terms, outside the confines of the Government's regulatory scheme." Pls. Mot. for Prelim. Inj. at 35.  To support this contention, Plaintiffs rely on the Supreme Court's decisions in Arizona Free Enter. Club's Freedom Club PAC v. Bennet, — U.S. —, 131 S. Ct. 2806 (2011) and Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc., — U.S. —, 133 S. Ct. 2321 (2013).  Plaintiffs misapply the holdings in Bennet and Agency for Int'l Dev..

_____

[30] There appears to be no prohibition that constrains the Plaintiffs from counseling against the use of contraceptive products or services, including for religious or moral reasons.

In Bennet, the majority found that Arizona's candidate matching funds process substantially burdened a political candidate's speech without a compelling interest, in violation of the First Amendment.  131 S. Ct. at 2813.  Under Arizona law, a publicly-financed political candidate was entitled to matching funds from the State for every dollar spent by an opposing, privately-funded candidate.  Id. The Arizona law also entitled the publicly-financed political candidate to matching funds from the State for every dollar spent by independent expenditure groups on behalf of the privately-financed candidate (or in opposition to the publicly-financed candidate).  Id.  A majority of the Supreme Court concluded that if a privately-financed candidate or an independent expenditure group engaged in political speech by spending campaign funds in excess of the initial funds available to a publicly-financed candidate, the State penalized the privately-financed candidate's speech with a dollar for dollar cash subsidy to his publicly-financed opponent.  Id. at 2818.  In the majority's view, the cash subsidy given by the State to the publicly-financed candidate "impose[d] an unprecedented penalty on any candidate who robustly exercise[d] [his] First Amendment rights."  Id. (citations and quotation marks omitted).  Here, the self-certification form does not penalize or inhibit any person's speech.  Plaintiffs do not dispute that the contents of the self-certification form are consistent with their beliefs even if they believe that the

form makes them complicit in a scheme to provide contraceptive products and services.  The form does not require the Plaintiffs to adopt a particular belief or endorse a message with which they disagree.

For these reasons, Plaintiffs' reliance on <u>Agency for Int'l Dev.</u> is also misplaced.  In that case, the HHS required nongovernmental organizations that received funds from Congress to eradicate HIV/AIDS to state, in an award document, their opposition to prostitution and sex trafficking.  133 S. Ct. at 2326. The plaintiffs argued that the funding condition required them "to censor their privately funded discussions in publications, at conferences, and in other forums about how best to prevent the spread of HIV/AIDS among prostitutes."  <u>Id.</u>  The Supreme Court held that the regulations required the Plaintiffs to "pledge allegiance to the Government's policy of eradicating prostitution" and compelled "as a condition of federal funding the affirmation of a belief that by its nature cannot be confined within the scope of the Government program.  In so doing, it violate[d] the First Amendment . . . ."  <u>Id.</u> at 2332.  The self-certification form does not require the Plaintiffs to "censor their discussions."  <u>Id.</u> at 2326.  It also does not require the Plaintiffs to "pledge allegiance to the Government's policy" of increasing access to contraceptive products and services.  <u>Id.</u> at 2332.  The compulsion to fill out a form and express statements that are consistent with

Plaintiffs' beliefs is merely incidental to the regulation of conduct—the conduct at issue here is the provision of contraceptive coverage, which is not inherently expressive.

Plaintiffs have failed to show that the contraceptive mandate or the accommodation compels them to speak in violation of the Free Speech Clause. Plaintiffs' Motion for Summary Judgment regarding their Compelled Speech claim is required to be denied.

### 4.    *"Gag-Order"*[31]

29 C.F.R. § 2590.715-2713(A)(b)(1)(iii) provides that once an eligible organization self-certifies and delivers the certification form to its TPA, "the eligible organization must not, directly or indirectly, seek to interfere with a [TPA's] arrangements to provide or arrange separate payments for contraceptive services for participants or beneficiaries, and *must not, directly or indirectly, seek to influence the [TPA's] decision to make any such arrangements*." (emphasis added).

"Above all else, the First Amendment means that government has no power

---

[31] This section of the Court's order applies only to CENGI and Catholic Charities. The Diocesan Plaintiffs cannot state a First Amendment claim because they are entirely exempt from the ACA, and the challenged restriction on speech applies only to "eligible organizations" that are required to self-certify and deliver the certification form to their TPA.

to restrict expression because of its message, its ideas, its subject matter, or its content." <u>Police Dep't of the City of Chicago v. Mosley</u>, 408 U.S. 92, 95 (1970). "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based." <u>Turner Broad. Sys. Inc. v. Federal Commc'n Comm'n</u>, 512 U.S. 622, 643 (1994). "Content-based regulations are presumptively invalid." <u>R.A.V. v. City of St. Paul</u>, 505 U.S. 377, 382 (1992). Content-based restrictions are subject to strict scrutiny, and the Government must show that the regulation furthers a compelling interest that is narrowly tailored to achieve that interest. <u>Solantic, LLC v. City of Neptune Beach</u>, 410 F.3d 1250, 1258 (11th Cir. 2005).

The Court finds that the second half of 29 C.F.R. § 2590.715-2713(A)(b)(1)(iii) is a presumptively invalid, content-based restriction on the non-exempt Plaintiffs' right to speak. The Government has imposed a blanket ban on CENGI and Catholic Charities prohibiting them from a wide spectrum of communications, including merely advising or persuading a TPA to not provide contraceptive coverage. The Government has not offered any explanation for justifying the infringement of the non-exempt Plaintiffs' freedom of speech. The Government chooses to repeatedly state that the regulation only prohibits an eligible organization from interfering with a TPA's decision to provide

contraception coverage through threats or economic coercion. The First

Amendment does not protect economic threats that interfere with the rights of

others. NLRB v. Gissel Packing Co., 395 U.S. 575, 618 (1969).[32] Plaintiffs' free

speech claim is based on the sweeping ban imposed by the Government that

prevents them from "directly or indirectly influencing" their TPA not to provide

contraceptive coverage. The Government does not offer any reasonable

explanation for placing such a blanket, bright-line content-based restriction on

Plaintiffs' freedom of speech.

The Government offers the tepid defense of the ban by pointing to another

regulation, which states that "nothing in these final regulations prohibits an eligible

organization from expressing its opposition to the use of contraception." 78 Fed.

Reg. at 39,880 n.41. The reliance on this regulatory footnote is, at best,

misleading. 29 C.F.R. § 2590.715-2713(A)(b)(1)(iii) explicitly prohibits the non-

exempt Plaintiffs from expressing their opposition to the use of contraception to

their TPA. This directly violates the Plaintiffs' free speech rights and there is no

justification for it. Plaintiffs are entitled to summary judgment on their claim that

the Final Rules unconstitutionally restrict their freedom of speech.

---

[32] Plaintiffs, however, do not challenge the first half of 29 C.F.R. § 2590.715-
2713(A)(b)(1)(iii), which prohibits them from placing economic pressure on the
TPA.

5.    *Establishment Clause*

Plaintiffs argue that the religious employer exemption in the Final Rules

violates the Establishment Clause because the Government grants an exception to

"houses of worship," "integrated auxiliaries," and "religious orders," but does not

exempt other religious organizations like CENGI and Catholic Charities that

"exercise their religion" through education and charity.  Pls.' Reply in support of

Motion for Summ. J. at 25.  The Establishment Clause to the First Amendment

provides that "Congress shall make no law respecting an establishment of

religion."  U.S. Const. amend. I.  The "clearest command of the Establishment

Clause is that one religious denomination cannot be officially preferred over

another."  Larson v. Valente, 456 U.S. 228, 244 (1982).

The religious employer exemption applies equally to all denominations and

religions that oppose contraception.  Line drawing by the Government based on the

structure and purpose of religious organizations is permissible under the

Establishment Clause.  Walz v. Tax Comm'n of the City of N.Y., 397 U.S. 664,

672-73 (1970) (upholding a religious exemption for property taxes because the

exemption did not "single[] out one particular church or religious group or even

churches as such; rather it has granted [an] exemption to all houses of religious

worship within a broad class of property owned by non-profit, quasi public

corporations."); <u>Droz v. Comm'r of Internal Revenue Serv.</u>, 48 F.3d 1120, 1124

(9th Cir. 1995) (upholding tax exemption because the Government can permissibly

distinguish among individuals who share identical religious beliefs).[33]

Plaintiffs assert that CENGI and Catholic Charities deserve special treatment

because they "exercise their religion" through education and charity.  All religious

denominations, Catholic and non-Catholic alike, have educational and charitable

arms.  The line drawn here is based on the structure and purpose of the religious

organization, which is permissible under the Establishment Clause, and the

religious employer exemption does not make distinctions based on religious

affiliation.  It is available to all religions.  Plaintiffs have failed to state a

cognizable claim based on the Establishment Clause, and their Motion for

Summary Judgment on the Establishment Clause claim is denied.  The

Government's Motion for Summary Judgment regarding the Plaintiffs'

---

[33] Plaintiffs claim that in <u>Colorado Christian Univ. v. Weaver</u>, 543 F.3d 1245 (10th
Cir. 2008), the Tenth Circuit struck down a statute that discriminated against
religious organizations based on their organization and purpose.  It did not.  In
<u>Weaver</u>, the statute discriminated among religious denominations because it
favored Catholic and Methodist schools, but disfavored an evangelical Protestant
university and a Buddhist institution.  <u>Id.</u> at 1258.  The Tenth Circuit concluded
that the statute facially discriminated among religious denominations by providing
scholarships to some sectarian schools, and declining to provide scholarships to
schools that the Government deemed as "pervasively sectarian."  <u>Id.</u>

Establishment Clause claim is granted.[34]

### 6.  Internal Church Governance

Plaintiffs argue that the contraceptive mandate violates the Religion Clauses of the First Amendment because it "splits" the Catholic Church into two different entities—one entity exempt from the mandate and the other entity compelled to facilitate contraceptive coverage through the accommodation.  Plaintiffs also allege that the contraceptive mandate interferes with the internal decisions of the Catholic Church because it prevents the Atlanta Archdiocese and the Savannah Diocese from supervising CENGI and Catholic Charities.  According to the Plaintiffs, if CENGI and Catholic Charities are required to comply with the contraceptive mandate, the Diocesan Plaintiffs cannot ensure that all of their affiliates are provided with health care plans that are consistent with Catholic beliefs.

---

[34] In their Second Amended Complaint, Plaintiffs also alleged that the religious employer exemption violates the Establishment Clause because the definition of a religious employer in the Final Rules is based on an intrusive 14-factor test applied by the Internal Revenue Service ("IRS").  The Government moved to dismiss this claim in its Motion to Dismiss, or in the alternative, for Summary Judgment.  Plaintiffs did not oppose the Government's Motion.  In opposing a motion for summary judgment, a "'party may not rely on his pleadings to avoid judgment against him.'"  Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (quoting Ryan v. Int'l Union of Operating Eng'rs, Local 675 (11th Cir. 1990)).  "Grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."  Id. (internal citations omitted).  Here, Plaintiffs abandoned their claim related to the 14-factor test applied by the IRS.  Defendants are thus entitled to summary judgment on Plaintiffs' claims regarding the 14-factor test applied by the IRS.

The Court agrees with the Government that this claim restates the Diocesan Plaintiffs' RFRA claim, and the Court is not persuaded by it for the reasons stated in Section II(B)(1)(i)(b)(iii) of this Order.  See also Roman Catholic Archdiocese of New York, 2013 WL 6579764, at *20.  The Religion Clauses of the First Amendment prohibit the Government from interfering with the internal decisions of a Church regarding ecclesiastical matters.[35]  The Plaintiffs do not provide authority to support their claim that the decisions of a Church regarding its health care plan are protected by the Religion Clauses.  Plaintiffs do not provide such authority because churches do not have an unfettered right to be free from government interference.

The Religion Clauses protect from government interference in ecclesiastical matters such as the freedom to select clergy, choose a bishop, and the resolution of disputes between different factions of a church over control of property. Hosanna-Tabor, 132 S. Ct. at 704-05.  Plaintiffs' reliance on Hossana-Tabor to support their novel claims of interference in internal church decisions is misplaced.

---

[35] The Religion Clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. I.  "By forbidding the 'establishment of religion' and guaranteeing the 'free exercise thereof,' the Religion Clauses ensured that the new Federal Government—unlike the English Crown—would have no role in filling ecclesiastical offices."  Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Emp't Opportunity Comm'n, — U.S. —, 132 S. Ct. 694, 703 (2013).

In <u>Hossana-Tabor</u>, the Supreme Court explicitly limited its holding to bar a minister's employment discrimination claim against a Church that terminated her. <u>Id.</u> at 710.  The Supreme Court stated that "we express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers." <u>Id.</u>  The "ministerial exception" is a well-established principle of constitutional law that bars employment discrimination claims brought against religious institutions by its ministers.  <u>Gellington v. Christian Methodist Episcopal Church, Inc.</u>, 203 F.3d 1299, 1301-04 (11th Cir. 2000).  It remains unclear whether such a well-established rule of law extends to a claim brought by a minister that falls outside the employment discrimination context.  <u>Hossana-Tabor</u> cannot be extended to apply to novel theories of interference in church decisions when the boundaries of a well-established exception for ecclesiastical matters is itself an open question left for the future.  The Court concludes that Plaintiffs' Motion for Summary Judgment regarding their internal church governance claim is required to be denied.

### 7.   *Delegation of Authority*

Plaintiffs argue that the ACA unconstitutionally delegates legislative power to the HHS because the ACA does not establish any standards to "which the HHS must adhere in determining which products and services constitute "'preventive

care.'"  Pls.' Mot. for Summ. J. at 54.  Congress may delegate its legislative

authority to another branch of government, so long as Congress "lay[s] down by

legislative act an intelligible principle to which the person or body authorized to

[act] is directed to conform."  Panama Refining Co. v. Ryan, 293 U.S. 388, 421

(1935).  Congress has the power to delegate its authority to a federal agency under

"*broad* general directives."  Mistretta v. United States, 488 U.S. 361, 372 (1989)

(quoting Opp Cotton Mills, Inc. v. Administrator, Wage and Hour Div. of Dept. of

Labor, 312 U.S. 126, 145 (1941) ("In an increasingly complex society Congress

obviously could not perform its functions if it were obliged to find all the facts

subsidiary to the basic conclusions which support the defined legislative policy."))

(emphasis added).

      The Women's Health Amendment of the ACA required the HRSA to

provide comprehensive guidelines regarding preventive care and screenings for

women.  42 U.S.C. § 300gg-13(a)(4).  This "broad general directive" is

indistinguishable from the delegations of authority previously upheld by the

Supreme Court.  In Yakus v. United States, 321 U.S. 414 (1944), the Supreme

Court upheld congressional delegation to an agency to fix prices in a "fair and

equitable manner," and in Whitman v. American Trucking Ass'ns, Inc., 531 U.S.

457 (2001), the Supreme Court upheld congressional delegation to an agency to set

standards "requisite to protect the public health."

Plaintiffs insist that the "mandate must fall" because the "purported standard [in the ACA] supplies no 'intelligible principle' for determining what constitutes 'preventive care' in the first instance." Pls.' Reply in support of Pls.' Mot. for Summ. J. at 26. This is a shallow claim that contradicts the Supreme Court's decisions. See Whitman, 531 U.S. at 474 (explaining that "[but] even in sweeping regulatory schemes we have never demanded, as the Court of Appeals did here, that statutes provide a 'determinate criterion' for saying 'how much [of the regulated harm] is too much.'"); see also Mistretta, 488 U.S. at 654; Opp Cotton Mills, Inc., 312 U.S. at 145. Plaintiffs' proposed rule of law demands an exacting standard to be established for agency action that misconstrues the nondelegation doctrine. The Constitution does not require Congress to identify each element of its broad authority with the specificity that Plaintiffs demand. The true nature of Plaintiffs' complaint is directed at jurisprudence related to the intelligible principle itself. The Court, therefore, denies the Plaintiffs' Motion for Summary Judgment regarding the HRSA's authority to draft recommendations concerning preventive care for women. The Defendants' Motion for Summary Judgment on this claim is granted.

8.    *Administrative Procedures Act*

Plaintiffs alleged in their Complaint that the contraceptive mandate and the accommodation violate the APA because they conflict with the Weldon Amendment.  The Weldon Amendment provides that "[n]one of the funds made available in this Act may be made available to a Federal agency or program, or to a State or local government, if such agency, program or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."  Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat. 786, 1111 (2011).  Plaintiffs did not raise this claim in their Motion for Summary Judgment.  Defendants moved to dismiss, and in the alternative, moved for summary judgment on Plaintiffs' APA claim.  Plaintiffs did not respond to Defendants' Motion to Dismiss, and in the alternative, for Summary Judgment on Plaintiffs' APA claim.  Defendants are entitled to summary judgment because Plaintiffs abandoned their APA claim.  See Resolution Trust Corp., 43 F.3d at 599.

9.    *The Remaining Requirements for Injunctive Relief*

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Elrod v. Burns, 427 U.S. 347, 373

(1976).  A violation of the RFRA also establishes irreparable injury.  Hobby

Lobby, 723 F.3d at 1146.  The Government's interest in enforcing the

contraceptive mandate against the non-exempt Plaintiffs does not outweigh the

interests of the non-exempt Plaintiffs because the Government has not shown a

compelling interest that is narrowly restricted to achieve its goals.  A permanent

injunction preserves the status quo whereas enforcement of the contraceptive

mandate violates the non-exempt Plaintiffs' statutory and constitutional rights.  See

Roman Catholic Archdiocese of New York, 2013 WL 6579764, at *21 (internal

citations omitted).  The public's interest is best served by enjoining regulations that

violate the RFRA and infringe on constitutional rights.  Hobby Lobby, 723 F.3d at

1147.

## III.    CONCLUSION

For the reasons discussed in this Order, the Court determines that the

Government is enjoined from enforcing the contraceptive mandate and the Final

Rules, including the requirement to execute a self-certification form, and deliver

the form to a TPA, against CENGI and Catholic Charities because enforcement of

the Final Rules would violate the RFRA.  The Government also is enjoined from

enforcing against CENGI and Catholic Charities the requirements of 29 C.F.R.

§ 2590.715-2713(A)(b)(1)(iii), which prohibits non-exempt organizations from

seeking to influence their TPA's decision regarding the provision of contraceptive products and services, because it is an unconstitutional, content-based restriction on CENGI's and Catholic Charities' right to the freedom of speech protected by the First Amendment.

Because the Atlanta Archdiocese and the Savannah Diocese are entirely exempt from the contraceptive mandate and the Final Rules, and the Government does not dispute that the Diocesan Plaintiffs are not required to comply with the requirement to execute a self-certification form and deliver the form to Meritain Health, it is unnecessary to separately enjoin enforcement of the contraceptive mandate and the Final Rules against the Diocesan Plaintiffs.[36]

Accordingly,

**IT IS HEREBY ORDERED** that the Defendants are **PERMANENTLY RESTRAINED** and **ENJOINED** from enforcing the contraceptive mandate against Plaintiffs CENGI and Catholic Charities.

**IT IS FURTHER ORDERED** that the Government is **PERMANENTLY**

---

[36] The Savannah Diocese operates its schools and charitable mission within the Diocese, rather than through separate entities like CENGI and Catholic Charities. Because the Savannah Diocese is exempt from the contraceptive mandate and the requirements to comply with the Final Rules, it is unnecessary to separately enjoin enforcement of the contraceptive mandate and the Final Rules against these activities of the Savannah Diocese.

**RESTRAINED** and **ENJOINED** from enforcing the requirement against CENGI and Catholic Charities to execute and deliver a self-certification form to their TPA.

    **IT IS FURTHER ORDERED** that Plaintiff CENGI and Plaintiff Catholic Charities' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part [78].  CENGI and Catholic Charities' Motion for Summary Judgment on their RFRA claim is **GRANTED**.  Summary Judgment on the claim that the accommodation violates the First Amendment because it places a content-based restriction on their freedom of speech is also **GRANTED**.  The Motion for Summary Judgment on their remaining claims is **DENIED**.

    **IT IS FURTHER ORDERED** that the Motion for Summary Judgment filed by Plaintiffs Atlanta Archdiocese, Savannah Diocese, Archbishop Gregory and Bishop Hartmayer is **DENIED AS MOOT** with respect to all claims, including claims based on the RFRA and the federal constitution, because, as the Government acknowledges, these Plaintiffs are exempt from the contraceptive mandate and the requirements of the accommodation [78].

    **IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment regarding the Plaintiffs' claims based on the Establishment Clause, the APA, and the unconstitutional delegation of congressional authority is **GRANTED** [64].

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction is **DENIED AS MOOT** [57].

**SO ORDERED** this 26th day of March, 2014.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE